913 F.2d 1262
 135 L.R.R.M. (BNA) 2409, 116 Lab.Cas. P 10,371
 Kaphy LONG, Lisa Sharring, Barbara Smith, Velma Metoyer,
Individually and on Behalf of a Class of Persons
Similarly Situated, Plaintiffs-Appellees,
v.
TRANS WORLD AIRLINES, INC., a corporation, Defendant-Appellant.
 No. 89-2214.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 13, 1990.
Decided Sept. 21, 1990.
 
 Samuel W. Witwer, Jr., Wayne B. Giampietro, Gregory N. Freerksen, Richard F. Sarna, Witwer, Burlage, Poltrock & Giampietro, Robert Balfour, Thomas R. Meites, Lynn S. Frackmam, Michael W. Mulder, Julia E. Getzels, Meites, Frackman & Mulder, Chicago, Ill., for plaintiffs-appellees.
 Edward S. Weil, Gordon B. Nash, Jr., Mark E. Furlane, Laurence A. Carton, Gardner, Carton & Douglas, Chicago, Ill., Michael A. Katz, Mt. Kisco, N.Y., for defendant-appellant.
 Before WOOD, Jr., and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 The plaintiffs, flight attendants for TWA, have brought this suit as a class action in the aftermath of their stormy 1986 strike against that airline. The parties are fighting over whether the plaintiffs were each entitled to receive a piece of paper from TWA. Of course, the paper had significance far beyond the typical memoranda, letters, and notices generated each day by American businesses. Called a "designated rights letter," the piece of paper that the plaintiffs sought would have entitled them to hiring preferences with other airlines. Because TWA refused to issue such a document, the plaintiffs filed this suit against the air carrier a few months after their union had voluntarily terminated the strike.
 
 I.
 
 2
 In 1990, the deregulation of the airline industry is a fait accompli, and the deregulated air carriers now fly the vagaries of the marketplace. In 1978, however, air carrier deregulation was an unknown quantity. The Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 ("ADA"), abandoned industry-wide fare structures, altered the procedures for entry into new markets, and phased out the Civil Aeronautics Board. See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 680, 107 S.Ct. 1476, 1478, 94 L.Ed.2d 661 (1987). Understandably, Congress was concerned that such a massive restructuring of the airline industry might displace large numbers of employees. As air carriers consolidated, jobs were likely to be eliminated. See Airline Employee Protection Program, 50 Fed.Reg. 53,094, 53,094 (1985).
 
 
 3
 To protect airline employees who may have relied on the industry's previous stability for job protection, Congress included the Employee Protection Program as part of the ADA. The protection program had two parts. First, it provided for governmental subsidies to airline employees adversely affected by deregulation; the subsidies, however, were contingent on congressional appropriations that never occurred. 49 U.S.C.App. Sec. 1552(a)-(c), (e). Second, the program gave hiring preferences to employees who had been with their airline for at least four years as of 1978. Id. Sec. 1552(d), (h)(1).
 
 
 4
 The ADA's hiring preference gives a right of first hire to eligible employees who have been "furloughed or otherwise terminated." Id. Sec. 1552(d). Subject to certain exceptions, an employee armed with this right can demand that another airline hire him or her over other new applicants.
 
 
 5
 Congress authorized the secretary of labor to promulgate regulations that would implement the Employee Protection Program. Id. Sec. 1552(f). After a lengthy administrative process, the Department of Labor ("DOL") released these regulations. See 29 C.F.R. pt. 220 (1989). A number of the provisions clarify some of the ambiguities in the statute. Employees not protected by the first-hire right now include (1) employees on strike, (2) employees terminated for cause, and (3) employees who quit voluntarily. Id. Sec. 220.10(b). The regulations define "terminated for cause" as the separation of an individual from employment for violation of an air carrier's "rules, policies, procedures, or practices pertaining to employee standards of conduct, job performance, or dependability." Id. Sec. 220.01(q).
 
 
 6
 Apart from clarifying ambiguities in the statute, the regulations also implement a procedure for identifying those employees eligible for first-hire rights. An air carrier must provide a notice to all furloughed or terminated employees, stating that the employee is entitled to exercise the right of first-hire. Id. Sec. 220.27(a). The notice, denominated a "designated rights letter," must be provided to the employee no later than the date of separation. Id. As labor strikers replaced by new hires and crossover employees, the plaintiffs' right to a designated rights letter is one of the issues in this suit.
 
 
 7
 The plaintiffs' employer, TWA, fulfilled congressional fears that deregulation might hurt individual air carriers. Financially suffering, TWA in 1985 and 1986 asked the plaintiffs' union, the Independent Federation of Flight Attendants ("IFFA"), for substantial concessions in the form of lower wages and work rule changes. TWA proposed changes in the parties' collective bargaining agreement that would have saved the airline somewhere between $88 and $110 million dollars. While the union was willing to acquiesce in some concessions, the parties were unable to come to an agreement, and on March 7, 1986, IFFA members went on strike.[1]
 
 
 8
 Before the strike began, TWA management had informed its flight attendants that it would hire permanent replacements for any strikers. The airline made good on this threat, using approximately 1,300 flight attendants who crossed the picket lines and 2,800 new hires to fill vacated positions. The plaintiffs are a class of flight attendants who participated in the strike. On May 17, 1986, the striking flight attendants made an unconditional offer to return to work.
 
 
 9
 Instead of welcoming back the estranged flight attendants, TWA remained loyal to the employees who had worked for the airline throughout the strike. TWA decided to retain all the new flight attendants hired during the strike. Also, former strikers lost their seniority rights to replace crossover junior flight attendants. The Supreme Court ultimately upheld TWA's decision not to reinstate the striking flight attendants. See TWA v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989).
 
 
 10
 Effectively out of work, three thousand former strikers had sufficient seniority to qualify as protected employees under the ADA's Employee Protection Program. IFFA officials contacted TWA and asked the airline to issue designated rights letters to its members. In September 1986, TWA responded with letters informing all of the plaintiffs that they did not qualify for first-hire rights. After further correspondence with the plaintiffs' legal counsel, TWA sent revised letters taking no position as to whether the plaintiffs qualified for first-hire rights. Neither piece of correspondence met the DOL's requirements for a designated rights letter. Unsurprisingly, other air carriers refused to treat the TWA letters as triggering the hiring preferences of the ADA's Employee Protection Program. It was not until February 1987 that TWA finally sent an unqualified designated rights letter in the proper form. By March 1989, TWA had rehired all of its formerly striking flight attendants.
 
 
 11
 In October 1986, the plaintiffs brought this suit seeking declaratory and compensatory relief for TWA's failure to issue that all-important piece of paper. With other airlines refusing to recognize their firsthire rights, the plaintiffs claim that they lost "a tremendous number of positions" simply because TWA refused to distribute designated rights letters. In essence, the plaintiffs seek compensation for lost wages and benefits during the period beginning with their unconditional offer to return to work and ending with each plaintiff's rehire. Of course, the plaintiffs' claim for declaratory relief has become moot with TWA's February 1987 issuance of an unqualified designated rights letter, but the plaintiffs' claim for damages remains. On cross motions for summary judgment on the issue of liability, the district court found in the plaintiffs' favor. See Long v. TWA, 704 F.Supp. 847 (N.D.Ill.1989). Although rejecting the plaintiffs' argument of estoppel, the district court held that the ADA created a private right of action in favor of the plaintiffs and that the plaintiffs were employees "furloughed or otherwise terminated" within the meaning of the act.
 
 
 12
 We accepted the district court's certification of these issues as controlling questions of law, and consequently, we have jurisdiction to hear TWA's appeal under 28 U.S.C. Sec. 1292(b). The certification of the plaintiff class is not before us; the issue on appeal is TWA's liability under the ADA. While undoubtedly important to the parties before us, our interpretation of the ADA will be of little continuing significance. The first-hire rights of the Employee Protection Program do not apply to airline employees terminated after October 1988. 49 U.S.C.App. Sec. 1552(d)(1).
 
 II.
 
 13
 Because Congress did not provide for any enforcement mechanism in the Employee Protection Program, the first question is whether the plaintiffs have any cause of action to assert. Every federal court that has addressed the question has found an implied cause of action under the statute, and we find their reasoning persuasive. See Crocker v. Piedmont Aviation, 696 F.Supp. 685, 688 (D.D.C.1988); Robinson v. American Airlines, 129 L.R.R.M. (BNA) 3058, 3059, 1987 WL 49708 (D.D.C. Nov. 17, 1987), dismissed after trial, 722 F.Supp. 757 (D.D.C.1989), aff'd, 908 F.2d 1020 (D.C.Cir.1990); McDonald v. Piedmont Aviation, 625 F.Supp. 762, 765-66 (S.D.N.Y.1986). Notably, the Supreme Court gave the McDonald opinion an approving citation in one of its more recent decisions. See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 687 n. 9, 107 S.Ct. 1476, 1482 n. 9, 94 L.Ed.2d 661 (1987).
 
 
 14
 The four-factor test of Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), provides the relevant analysis in deciding whether a statute contains an implied cause of action. See Thompson v. Thompson, 484 U.S. 174, 179, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). Of course, the ultimate question is whether Congress intended to provide a private cause of action, see Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S.Ct. 2479, 2488-89, 61 L.Ed.2d 82 (1979), but the Cort analysis is helpful in making this inquiry, see Healy v. Bergman, 609 F.Supp. 1448, 1452 (D.Mass.1985) (making a similar use of Cort factors). While the Supreme Court has "abandoned its hospitable attitude towards implied rights of actions," Thompson, 484 U.S. at 190, 108 S.Ct. at 521-22 (Scalia, J., concurring), the Court has not taken the judiciary altogether out of the business of finding implied causes of actions. When appropriate, the federal courts have continued to recognize causes of actions where Congress did not expressly provide for them. See, e.g., Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); Centel Cable TV v. Admiral's Cove Assocs., 835 F.2d 1359 (11th Cir.1988); Bosco v. Serhant, 836 F.2d 271 (7th Cir.1987), cert. denied, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); Student Coalition for Peace v. Lower Merion School Dist. Bd., 776 F.2d 431, 440-41 (3d Cir.1985).
 
 
 15
 Under the Cort analysis, we first ask whether the plaintiffs are part of the class for whose especial benefit the statute was enacted. 422 U.S. at 78, 95 S.Ct. at 2087-88. The program's right of first hire runs directly to "[e]ach person who is a protected employee of an air carrier." 49 U.S.C. App. Sec. 1552(d)(1). In civil rights cases, similar language has been found instructive of congressional intent to create a private right of action. See Cannon, 441 U.S. at 689-94, 99 S.Ct. at 1953-56. TWA asserts that while Congress may have intended airline employees generally to have a cause of action, it did not intend for replaced labor strikers to enjoy the same rights. This argument, however, would force the plaintiffs to show they fit within the ADA's statutory language of "furloughed or otherwise terminated"--in essence showing that they would win their case. At this stage, the analysis is more general; the plaintiffs need only show that they are within the larger class of persons whom the statute seeks to protect. We think it is beyond argument that Congress intended the ADA's Employee Protection Program to benefit unemployed airline employees.
 
 
 16
 The second question is whether there are any indications of congressional intent to provide a private remedy. Cort, 422 U.S. at 78, 95 S.Ct. at 2087-88. The legislative history is silent as to whether Congress intended a private cause of action to be implicit in the ADA. See McDonald, 625 F.Supp. at 765. It is not necessary that an intention to create a private cause of action appear in the legislative record, although an explicit intent to deny a cause of action would end our inquiry. Cort, 422 U.S. at 82, 95 S.Ct. at 2089-90. Thus, we can draw no adverse inferences from the absence of a legislative history on this point. As the district court observed, given that the Employee Protection Program's language runs directly to the airline employees' benefit, the silent record further supports the notion that Congress intended these classes of plaintiffs to be the means of enforcing the statute. See Long, 704 F.Supp. at 854.
 
 
 17
 Our third area of inquiry is whether it would be consistent with the underlying purposes of the legislative scheme to imply a cause of action. Cort, 422 U.S. at 78, 95 S.Ct. at 2087-88. TWA contends that protection of economic strikers would be inconsistent with the Employee Protection Program's provisions, which TWA interprets as only assisting employees in the event of a work force reduction. TWA reads the statute too narrowly. Congressional concerns over deregulation's impact on front-line air industry employees prompted the passage of the Employee Protection Program. In this case, the industry's economic climate after deregulation forced TWA to ask the IFFA to agree to concessions at the bargaining table. Just because the union tried to protect its interests through a labor strike does not mean that the hardships suffered by individual union members were any less the result of airline deregulation. The Senate version of the ADA expressly conditioned eligibility for the Employee Protection Program on the employee's showing of a link between her job loss and deregulation. See Airline Employee Protection Program, 50 Fed.Reg. 53,094, 53,095 (1985). In abandoning this requirement for the bill's final version, Congress recognized the difficulty of trying to identify the causes of individual job losses in an ever-changing, deregulated airline industry.[2] In this case, the plaintiffs lost their airline jobs amidst economic upheaval in the industry. The ADA's Employee Protection Program seeks to mitigate this type of loss, making it consistent with the legislative scheme to imply a cause of action.
 
 
 18
 Finally, under Cort, we ask whether the cause of action is one relegated to state law. 422 U.S. at 78, 95 S.Ct. at 2087-88. TWA can barely argue that the labor rights of the airline industry's employees is not generally a federal concern. Because state law would not provide airline employees with the right of first hire that the ADA does, there is little chance that recognizing a cause of action for the plaintiffs would interfere with state interests. Thus, analyzing the case under the Cort factors and considering the relevant precedents, leads us to the conclusion that a cause of action should exist for airline employees under the ADA's Employee Protection Program.
 
 
 19
 TWA, however, cautions us to look before we leap, to consider the source of the plaintiffs' complaint before we find a cause of action. The plaintiffs are upset because TWA never issued a designated rights letter, which would have stated their entitlement to first-hire rights. The ADA itself does not mention such a letter; it is only under the DOL's regulations that a duty to issue the letter arises, and the Supreme Court has cautioned against implying a cause of action solely on the basis of administrative regulations. See Touche Ross, 442 U.S. at 577 n. 18, 99 S.Ct. at 2489 n. 18; see also Shapiro v. United States, 566 F.Supp. 886, 889 (E.D.Pa.1983). The plaintiffs' cause of action, while factually bound to TWA's failure to issue a designated rights letter, draws its essence from the statute itself. For this reason, we did not use the separate analysis that some courts have used when a cause of action is drawn from regulations. See, e.g., Angelastro v. Prudential-Bache Sec. Inc., 764 F.2d 939, 947-48 (3d Cir.), cert. denied, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir.1984).
 
 
 20
 By refusing to issue a designated rights letter, TWA essentially thwarted the plaintiffs' statutory first-hire rights. Even in the absence of a regulatory requirement to issue a designated rights letter, the plaintiffs would still have a cause of action if TWA had taken the actions it took in this case. The regulations only use a designated rights letter as the mechanism to confirm an employee's status as eligible for a right of first-hire. See Airline Employee Protection Program, 50 Fed.Reg. 53,094, 53,097 (1985). By refusing to issue a letter, however, TWA was implicitly informing other airlines of its belief that the plaintiffs had no first-hire rights. If TWA instead had posted notices in industry publications stating that its formerly striking flight attendants had no first-hire rights, the effect would have been the same. As the plaintiffs' former employer, TWA's opinion as to their entitlement to ADA first-hire rights would have a significant impact on other carriers' willingness to recognize these rights; in an extreme case, a competing air carrier might even expose itself to legal liability for tampering with TWA employees, if it recognized first-hire rights that the employees did not have. Whether it takes the form of the failure to issue a designated rights letter or other conduct not contemplated by the regulations, the plaintiffs should have a cause of action for TWA's interference with their right to go to another airline and use their right of first-hire.
 
 
 21
 The Supreme Court has also interpreted the Employee Protection Program's administrative regulations as ministerial. In Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987), the issue was whether the Employee Protection Program's invalid legislative veto provisions were severable from the rest of the act. The Supreme Court found the provisions severable, noting that regulations promulgated under the authority the ADA gives to the DOL, see 49 U.S.C.App. Sec. 1552(f), were unnecessary to implement the statute's first-hire rights. 480 U.S. at 689, 107 S.Ct. at 1483. The regulations' "primary focus is on mechanical details--notices to be sent, information to be published, and procedures to be followed." Id.
 
 
 22
 So far, courts have recognized a cause of action under the ADA's Employee Protection Program only when the plaintiff was suing the airline obligated under the act to hire. We agree with the plaintiffs that a cause of action is also implicit in the ADA when an employer interferes with its employees' entitlement to exercise the ADA's right of first hire.
 
 
 23
 Having found an implied cause of action to exist, the next question is whether the plaintiffs, replaced labor strikers, have a right of first-hire under the Employee Protection Program.[3] To answer this question, we have to look to the language of the statute itself. First-hire rights are extended to airline employees who are "furloughed or otherwise terminated," other than for cause. 49 U.S.C.App. Sec. 1552(d)(1). The DOL's regulations define some of these terms. The regulatory definition for "terminated" merely repeats the obvious: "terminated" means terminated from employment. 29 C.F.R. Sec. 220.01(p) (1989). The regulations are more helpful with "terminated for cause": this term means disciplinary separation from employment for violation of airline work rules relating to job performance. Id. Sec. 220.01(q).
 
 
 24
 Effectively told by their employer that they were no longer wanted, former labor strikers wanting to return to work fit within the common understanding of the words "furloughed" and "terminated." TWA took action to end their employment by hiring permanent replacements and crossover employees to fill the strikers' positions. The plaintiffs had a lawfully protected right to strike, and the Supreme Court upheld the legal rights of TWA to take the actions that it did. See TWA v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989). But it is not a question of labor/management relations; the result would be no different if TWA had separated the plaintiffs for reasons not related to a labor dispute. The Employee Protection Program entitles airline employees separated from employment to exercise first-hire rights. The practical result of TWA's actions was to cease the plaintiffs' employment with that airline. Congress passed the Employee Protection Program to protect airline employees in these circumstances.
 
 
 25
 TWA has one statutory safe harbor that it navigates toward. The airline contends that as economic strikers,[4] the plaintiffs were replaced "for cause," a category of terminated airline employees that neither the statute nor the regulations protects. See 49 U.S.C.App. Sec. 1552(d)(1); 29 C.F.R. Sec. 220.10(b)(5). TWA argues that it had to replace the strikers to keep its airline operational and this constitutes "cause." Calling these economic concerns "cause" within the statutory meaning of the ADA contradicts the DOL's interpretation of "cause" as purely disciplinary reasons. See 29 C.F.R. Sec. 220.01(q) (1989). More fundamentally, TWA's argument would turn the Employee Protection Program on its head. If financial considerations exempted an employee from entitlement to first-hire rights, there would be little left for the program to protect. The entire point of the Employee Protection Program is to provide a measure of job stability against the economic convolutions of a deregulated airline industry. We reject TWA's broad definition of the term "for cause" in the Employee Protection Program.
 
 
 26
 While far from being the sole basis for our decision, DOL's interpretation of the Employee Protection Program provides further support for our position. Under the regulations, striking employees may not exercise the Employee Protection Program's first-hire rights. Id. Sec. 220.10(b)(4). The regulations are silent, however, on what happens when the strike is over and the employees want to return to work. In the DOL's interpretation of its own regulations, however, it believed that "terminations for being on strike" were involuntary terminations within the coverage of the Employee Protection Program. See Airline Employee Protection Program, 50 Fed.Reg. 53,094, 53,097 (1985). Based on what the airline contends were contrary positions in DOL briefs before the district court in Alaska Airlines, Inc. v. Brock, 632 F.Supp. 178 (D.D.C.1986), aff'd, 809 F.2d 930 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 145, 98 L.Ed.2d 100 (1987), TWA argues that we should give little deference to the department's interpretation. The statements in the DOL briefs are somewhat ambiguous, and we hesitate to treat these briefs as official DOL policy when a clearer statement of the department's position appears in the Federal Register, accompanied by the safeguards of the deliberative administrative process used in promulgating final agency rules. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988).
 
 III.
 
 27
 When the plaintiffs voluntarily offered to end their strike and return to work, they were effectively suspended from employment by their employer. The ADA's Employee Protection Program entitles the plaintiffs to exercise a right of first-hire and provides a cause of action for them to enforce these rights. As their employer, TWA interfered with that right and has to respond to the plaintiffs for damages. Accordingly, the judgment of the district court is
 
 
 28
 AFFIRMED & REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 For a detailed account of the 1986 flight attendants strike of TWA, see the district court opinion in Independent Federation of Flight Attendants v. TWA, 682 F.Supp. 1003 (W.D.Mo.1988), aff'd, 878 F.2d 254 (8th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990)
 
 
 [2]
 To be eligible for the Employee Protection Program's hypothetical governmental subsidies, an airline employee would have to show that her position was terminated because of the airline's bankruptcy or at least a seven and a half percent reduction in the airline's work force. See 49 U.S.C.App. Sec. 1552(b), (h). With the public fisc directly at stake, Congress evidently believed that the cost of identifying eligible employees was justified. The absence of a similar qualification in the Employee Protection Program's first-hire provisions further suggests that Congress intended them to serve a broader remedial purpose
 
 
 [3]
 The plaintiffs contend that TWA should be judicially or collaterally estopped from asserting that the ADA does not protect replaced labor strikers. The plaintiffs assert that TWA took a contrary position before the district court in Alaska Airlines, Inc. v. Brock, 632 F.Supp. 178 (D.D.C.1986), aff'd, 809 F.2d 930 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 145, 98 L.Ed.2d 100 (1987). These doctrines are discretionary, see, e.g., In re Cassidy, 892 F.2d 637, 642 (7th Cir.1990); Ross-Berger Cos. v. Equitable Life Assurance Soc'y, 872 F.2d 1331, 1337 (7th Cir.1989), petition for cert. filed, No. 89-1734 (U.S. May 7, 1990); Garza v. Henderson, 779 F.2d 390, 393 (7th Cir.1985), and we are uncertain that the plaintiffs have demonstrated the necessary elements to invoke them. Consequently, we decline to estop TWA from pressing this argument in a case of this relative importance
 
 
 [4]
 In Independent Federation of Flight Attendants v. TWA, 682 F.Supp. 1003 (W.D.Mo.1988), aff'd, 878 F.2d 254 (8th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), it was decided that the 1986 IFFA strike of TWA was an "economic strike" as that term is used in labor law