John W. ACKERMAN, et al., Plaintiffs,

v.

NORTHWEST AIRLINES,
INC., Defendant.

Civ. No. 4–93–445.

United States District Court,
D. Minnesota,
Fourth Division.

April 5, 1994.

Stephen D. Gordon, Gordon Miller & O'Brien, Minneapolis, MN, Stuart A. Goldstein, Goldstein Law Office, Miami, FL, Carl H. Hoffman, Hoffman & Hertzig, Coral Gables, FL, for plaintiffs.

Gerald T. Stack, pro se.

Karen Clauson Maki, Thomas W. Tinkham, Dorsey & Whitney, Minneapolis, MN, Margaret H. Spurlin, John Joseph Gallagher, Kenneth M. Willner, Paul, Hastings, Janofsky & Walker, Washington, DC, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of Northwest Airlines, Inc. ("Northwest") to dismiss or for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court denies Northwest's motion to dismiss and grants in part and denies in part the motion for summary judgment.

## BACKGROUND

Plaintiffs are 41 former Braniff, Inc. pilots who allege that Northwest violated their first hire rights under section 43(d) of the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 1552(d).[1] Plaintiffs filed suit on October 30, 1992. Plaintiffs allege that on October 24, 1978, they were pilots employed for at least 4 years by Braniff Airways, Inc. ("Braniff Airways"). In May 1982, Braniff Airways abruptly ceased all operations, fulfilling congressional fears that deregulation might hurt individual air carriers. Twenty-nine of the 41 pilots allege they applied for jobs with Northwest in 1982, shortly after Braniff Airways ceased operations.

Braniff Airways sought to reorganize under Chapter 11 of the Bankruptcy Code. During the reorganization, Braniff Airways was renamed the Dalport Corporation and Braniff, Inc. was formed as a subsidiary to conduct domestic airline operations. Braniff, Inc. hired plaintiffs in 1984 and continued to employ them as pilots until it ceased operations in 1989. Two of the 41 pilots apparently applied for jobs as pilots with Northwest between 1984 and 1989. All but three of the 41 pilots allege they applied for jobs with Northwest around October 1989 after Braniff, Inc. ceased operations. Sixteen of the 41 pilots allege they applied for jobs as pilots with Northwest in 1992.

---

1. Northwest does not dispute that there is an implied private right of action under section 43(d). *See Long v. Trans World Airlines, Inc.,* 913 F.2d 1262, 1265 (7th Cir.1990); *McDonald v. Piedmont Aviation, Inc.,* 625 F.Supp. 762, 766 (S.D.N.Y.1986) *cited with approval in Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 687 n. 9, 107 S.Ct. 1476, 1481 n. 9, 94 L.Ed.2d 661 (1987).

Northwest moves to dismiss or for summary judgment contending that: (1) plaintiffs cannot state a claim for relief under section 43(d) because Northwest's duty to hire expired on October 23, 1988; (2) plaintiffs cannot state a claim for relief because their rehire rights were extinguished in 1984 when they were hired by Braniff, Inc.; and (3) most of the claims are time barred.

## DISCUSSION

### 1. The Airline Deregulation Act of 1978

After 40 years of extensive regulation of the commercial airline industry, Congress enacted the Airline Deregulation Act of 1978 to make air transportation more competitive. Congress wanted to ensure, however, that the benefits to the public flowing from deregulation would not be "paid for" by airline employees who had relied on the heavily regulated nature of the industry. S.Rep. No. 95–631, p. 114 (1978). To protect airline employees from the potentially harsh repercussions of deregulation, Congress included an Employee Protection Plan ("EPP") when it enacted the ADA. *See* 49 U.S.C.App. § 1552. The EPP provides for sweeping benefits, in the event of work force reductions, to "protected employees." Protected employees are defined as persons "who, on October 24, 1978, [have] been employed at least four years by an air carrier holding a certificate issued under section 1371 of this appendix [49 U.S.C.]." 49 U.S.C.App. § 1552(h)(1).[2]

The EPP consists of two parts. The first part establishes a program of monthly assistance payments to dislocated airline employees until they obtain comparable employment. No funds have been appropriated to the assistance program so it has not become operative.[3] The second part of the EPP gives protected employees a "first right of hire" and imposes on airlines certified under the prior regulatory system a "duty to hire" protected employees when hiring additional employees. The duty to hire provision states that:

> Each person who is a protected employee of an air carrier which is subject to regulation by the Civil Aeronautics Board who is furloughed or otherwise terminated by such an air carrier (other than for cause) prior to the last day of the 10–year period beginning on October 24, 1978 shall have first right of hire, regardless of age, in his occupational specialty, by any other air carrier hiring additional employees which held a certificate issued under section 1371 of this title prior to October 24, 1978. Each such air carrier hiring additional employees shall have a duty to hire such a person before they hire any other person, except that such air carrier may recall any of its own furloughed employees before hiring such a person.

49 U.S.C.App. § 1552(d)(1). Congress imposed the duty to hire on air carriers to ensure reemployment of protected airline employees and also to limit as much as possible the potential expenditure of government funds.[4]

### 2. Duration of the Statutory Duty to Hire

■ Northwest contends that its duty to hire protected employees expired on October 23, 1988. Northwest relies on a recent decision of the United States District Court for the District of Columbia. *See Crocker v. Piedmont Aviation, Inc.*, No. 86–1673, slip op. (D.D.C. May 4, 1993). In *Crocker*, the

---

2. For purposes of this motion, the court assumes that the pilots became "protected employees" under the EPP in May 1982 when they were terminated by Braniff Airways.

3. For purposes of monthly assistance payments, "[a]n eligible protected employee shall be a protected employee who an (sic) account of a qualifying dislocation (A) has been deprived of employment, or (B) has been adversely affected with respect to his compensation." 49 U.S.C.App. § 1552(a)(1). Before any payments can be made, the Department of Transportation ("DOT") must rule there has been a qualifying

dislocation the major cause of which is the change in regulatory structure. Since the passage of the ADA, the DOT has not determined there has been a qualifying dislocation. However, the DOT is conducting an ongoing investigation concerning whether nine air carriers experienced a qualifying dislocation.

4. Congress authorized the Secretary of Labor to promulgate regulations that would implement the EPP. *Id.* § 1552(f). After a lengthy administrative process, the Department of Labor ("DOL") released the regulations in 1985. *See* 29 C.F.R. pt. 220.

district court, citing section 43(d)(1), held that a covered carrier has no duty to give the right of first hire to protected employees after 1988 because "Congress limited the duration of section 1552 to ten years, the period between 1978 and 1988." *Id.* slip op. at 6.

The court respectfully disagrees with that construction of the duty to hire provision. Congress selected ten years as the period to allow for the full effects of deregulation to be felt by airline employees. Section 43(d)(1) gives a first right of hire to protected employees who are "furloughed or otherwise terminated by . . . an air carrier (other than for cause) prior to the last day of the 10–year period beginning on October 24, 1978." The time limit specified in section 43(d) defines the group eligible for benefits under the duty to hire provision. *See* 29 C.F.R. § 220.01(h) ("Eligibility period" defined as the "ten year period beginning on October 24, 1978.").[5] The eligibility period does not purport to bar protected employees from exercising their rehire rights after 1988. *See McDonald v. Piedmont Aviation, Inc.,* 695 F.Supp. 133, 137 (S.D.N.Y.1988) ("The statute defines 'protected employees' as those who are separated from employment between October 24, 1978 and October 24, 1988. . . . this time limit was chosen to define the group eligible for the benefits of the EPP, and is unrelated to the right of any one of them to bring a cause of action to enforce his rights, once established.").[6] Nor does expiration of the eligibility period curtail the duty imposed on air carriers to hire protected employees.

Northwest also relies on the sunset provision of the ADA which provides that "[t]he terms of this section shall terminate on the last day the Secretary is required to make a payment under this section." 49 U.S.C.App. § 1552(j). To date, the Secretary has not

been required to make any payments under the EPP. The regulations enacted by the DOL define the "Effective period" of the EPP as:

> the period commencing on the effective date of these regulations and ending on the later of: (1) October 23, 1988, or (2) the last day of the final month in which the Secretary is required to make a payment under section 43 of the Act; except that nothing in these regulations shall preclude the exercise of statutory rights and duties between October 24, 1978, and the effective date of these regulations.

29 C.F.R. § 220.01(g).[7] Northwest argues that the duty to hire terminated on October 23, 1988, because the Secretary has made no assistance payments and may never make any payments. The DOL has decided, however, that the duty to hire under section 43(d) remains in effect indefinitely and that covered carriers must continue to hire protected employees. *See* DOL's Letter to Alaska Airlines, dated November 8, 1991. That position is consistent with the statutory language and the congressional goal of ensuring reemployment of protected employees while limiting any potential expenditure of government funds.[8]

Northwest contends that the lack of a specific date for the termination of duty to hire obligations under the ADA places an intolerable burden of uncertainty on air carriers and affected employees. Although the duty to hire provision does not expire on a date certain, the obligations of air carriers are not without limits. By definition the first hire rights are confined to a finite group of protected employees under the ADA. As noted above, protected employees terminated or furloughed after October 23, 1988 no longer obtain a first right of hire. Airline employ-

**5.** *Accord Bowdry v. United Air Lines, Inc.,* 956 F.2d 999, 1004 n. 4 (10th Cir.1992); *Long,* 913 F.2d at 1265.

**6.** *Accord Crocker v. Piedmont Aviation, Inc.,* 933 F.2d 1024, 1026 (D.C.Cir.1991) (holding that "the EPP itself imposes no limits on the length of a protected employee's first-hire right and we do not believe the statutory restrictions on financial assistance should be engrafted on the first-hire provisions.") (footnote omitted). *But see Haggerty v. USAir, Inc.,* 952 F.2d 781, 785 (3d Cir.1992)

(stating that the EPP "was designed to be in effect for only ten years.").

**7.** The regulations also provide that "[t]his program and these regulations terminate on the last day of the effective period." *Id.* § 220.50(b).

**8.** *See Crocker,* 933 F.2d at 1027 (DOL's interpretation of the EPP is entitled to deference unless inconsistent with the statutory language) (citation omitted).

ees must also, on October 24, 1978, have been employed at least 4 years by a covered carrier. 49 U.S.C.App. § 1552(h)(1).[9] The court concludes that, while Congress did not specify when the duty to hire expires, it did limit the obligations imposed on air carriers by carefully circumscribing the number of airline employees eligible for benefits under the EPP.

### 3. Eligibility of Plaintiffs

■ Plaintiffs were terminated by Braniff Airways when it ceased operations and declared bankruptcy in May 1982. Braniff Airways reorganized under Chapter 11 of the Bankruptcy Code. Braniff Airways was renamed the Dalport Corporation and Braniff, Inc. was formed as a subsidiary to conduct domestic airline operations. Braniff, Inc. hired plaintiffs in 1984 and continued to employ them as pilots until it ceased operations and declared bankruptcy in October 1989. Northwest contends that plaintiffs relinquished their first hire rights when they accepted positions with Braniff, Inc. in 1984.

### A. Reorganization of Braniff Airways

Braniff Airways, a wholly-owned subsidiary of Braniff International Corporation ("Braniff International"), provided scheduled service in domestic and international air transportation for over four decades until it ceased operations on May 12, 1982. Braniff Airways, its parent, and another subsidiary of Braniff International filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. Braniff Airways sought an investor to fund a revitalized airline business.

On June 23, 1983, H. Group Holding, Inc., the parent of Hyatt Corporation, agreed to form a new subsidiary, Hyatt Air, Inc. ("Hyatt Air") to purchase control of a reorganized airline operation. The plan was approved by the bankruptcy court on September 1, 1983. Under the plan, Braniff Airways was renamed the Dalport Corporation ("Dalport").[10] Hyatt Air provided Dalport with an infusion of capital in the form of equity and debt.[11] Hyatt Air owned an 80 percent equity interest in Dalport, enabling it to control Braniff, Inc., a newly formed Nevada corporation.

Braniff, Inc. began operating on March 1, 1984 with new owners, a new capital structure, a new management team and a new service proposal. The management team of Braniff, Inc. included newly recruited individuals from other air carriers and individuals who worked for Braniff Airways. Braniff, Inc. was a much smaller carrier than Braniff Airways. Braniff, Inc. operated a fleet of 30 Boeing 727 aircraft leased from a liquidating trust formed under the bankruptcy plan. The aircraft were formerly owned by Braniff Airways, which operated a fleet of more than 60 aircraft. Braniff Airways serviced 50 domestic cities as well as international routes. Braniff, Inc. provided service to approximately 10 cities in the United States and did not have any international routes. Braniff, Inc. leased certain airport gates around the country that had been previously leased to Braniff Airways.[12] Braniff Airways employed 2,200 pilots; Braniff, Inc. started with 400 pilots. Braniff, Inc. hired more pilots after its initial start-up but never employed 1,000 pilots. Pilots who flew for Braniff, Inc. were paid less than half the amount they earned at Braniff Airways.

Substantially all of Braniff, Inc.'s employees were former employees of Braniff Airways. During the reorganization, Braniff

---

**9.** The court notes that the group of potential claimants under section 43(d) is further restricted due to the mandate of the Federal Aviation Administration that pilots retire at age 60.

**10.** Braniff International was liquidated after merging with its subsidiaries except for Braniff Airways. Dalport conducted fixed based services for Braniff, Inc. and other carriers. Braniff, Inc. leased its general headquarters and offices, reservation offices and warehouses at Love Field in Dallas from Dalport.

**11.** Hyatt Air made an equity investment of $5 million in Dalport and lent Dalport $15 million in exchange for an unsecured promissory note; an additional $50 million in third party financing was guaranteed by Hyatt Air and its parent company.

**12.** The FAA distributed the landing slots assigned to Braniff Airways to other carriers in May 1982 but subsequently returned certain slots to Braniff, Inc.

Airways negotiated with its former employees and their unions, including the pilots and their representative, the Air Line Pilots Association ("ALPA"). Braniff Airways and the ALPA executed a collective bargaining agreement on June 22, 1983. The agreement provided that former Braniff Airways pilots would be offered employment based strictly on their seniority with Braniff Airways when it ceased operating. The pilots would not have to serve a 12 month probationary period or undergo a physical examination if they had valid FAA medical certificates. The seniority of pilots who accepted such employment was based exclusively on service with Braniff, Inc., however, and no credit was given for service with Braniff Airways.[13]

The effective date of the agreement was triggered by the implementation of the reorganized airline described in the bankruptcy plan. The agreement also provided for an assignment from Braniff Airways to Braniff, Inc. The agreement stated that Braniff Airways intended to form a subsidiary, Braniff, Inc., to conduct domestic airline operations. Braniff Airways agreed to assign its rights and Braniff, Inc. agreed to assume all obligations of Braniff Airways under the agreement.[14] Braniff International sent a letter to former pilots informing them of the new collective bargaining agreement. The letter spoke of "potential reemployment with Braniff Airways" and "recall" and urged the pilots to "rejoin the New Braniff."

## B. Certification of Braniff, Inc.

On December 5, 1983, Braniff Airways and Braniff, Inc. filed an application with the Civil Aeronautics Board ("Board") for transfer to Braniff, Inc. of Braniff Airways' certificate for domestic routes. At that time, the Board was charged with ensuring that applicants for certificate authority are "fit, willing and able" to perform properly the transportation covered by the application, and to conform with the requirements of the Federal Aviation Act and the Board's rules and regulations. 49 U.S.C. § 1371. The Board decid-

ed a formal investigation into the fitness of Braniff, Inc. was needed because the application presented "more than merely a certificate transfer to a wholly-owned subsidiary." *Braniff, Fitness Investigation,* 105 C.A.B. 1 (January 6, 1984). The Board identified substantial differences between the two carriers and concluded that Braniff, Inc. was akin to a nonoperating carrier seeking initial certification. *Id.*

To determine the fitness of Braniff, Inc., the Board considered its managerial expertise, financial plan and compliance disposition. *Braniff, Fitness Investigation,* 106 C.A.B. 1, 9 (February 9, 1984). The Board readily endorsed the managerial team and financial structure of Braniff, Inc. *Id.* at 21–33. The Board was troubled, however, by Braniff Airways' poor compliance record and expressly stated that it would have "serious reservations" if the application "involved a recertification of Braniff Airways and not Braniff, Inc." *Id.* at 33. The Board noted that, although Braniff, Inc. would hire many former employees of Braniff Airways, the key management personnel were not previously affiliated with Braniff Airlines. *Id.* at 35. The Board characterized Braniff, Inc. as "a new carrier arising from the ashes of Braniff Airways." *Id.* at 37. The Board concluded that "the only real connection" between the carriers was the use of the Braniff name and the use of certain assets. *Id.* The Board found that Braniff, Inc. possessed the necessary compliance disposition. Having determined that Braniff, Inc. was a fit carrier, the Board held that "Braniff, Inc. should be issued the certificate previously held by Braniff Airways, Incorporated." *Id.* at 42.

## C. Designated Status Under the DOL Regulations

Section 220.10 of 29 C.F.R. establishes eligibility requirements for protected employees. The regulation provides that:

---

**13.** Pilots could elect to defer their recall for two years from the start of Braniff, Inc. Former pilots of Braniff Airways who were not offered employment were considered furloughed pilots under the collective bargaining agreement.

**14.** On December 12, 1983, the collective bargaining agreement was assumed by Braniff, Inc.

To qualify as a designated employee eligible for rights under this part 220, an applicant must be a protected employee who is involuntarily placed on furlough or is terminated by a covered air carrier during the eligibility period.

29 C.F.R. § 220.10(a). The regulations define a "covered air carrier" as "an air carrier which was certified prior to October 24, 1978." *Id.* § 220.01(e). Another regulation also provides that:

A designated employee who is recalled by his former carrier is no longer eligible under this section to exercise the first-right-of-hire. Such a person may become a designated employee in the future due to a subsequent termination or furlough which occurs on or prior to the expiration of the eligibility period.

*Id.* § 220.10(c). The DOL has determined that the right to first hire continues until a protected employee is hired by an air carrier that held a certificate before deregulation and that rehire rights are not lost upon employment by a noncertificated carrier. *See* DOL's Letter to United Airlines, dated January 3, 1991 (rehire rights continue until protected employee obtains a job with a covered air carrier).[15] The D.C. Circuit has endorsed the DOL's interpretation of section 43(d) as reasonable and consistent with the language and intent of the statute. *See, e.g., Crocker,* 933 F.2d at 1027–29.[16]

The DOL has considered the exact issue facing the court and decided that "employees of Braniff Airways and Braniff, Inc., who are otherwise eligible, continue to have the first right of hire with air carriers holding a certificate issued prior to October 24, 1978." *See* DOL's Letter to United Airlines, dated January 3, 1991. The DOL found that "for purposes of first right of hire determinations, Braniff, Inc. was a different carrier than Braniff Airways." *Id.* The DOL concluded that Braniff, Inc. was not a covered air carrier because it "operated under a certificate issued on February 24, 1984, which is after the October 24, 1978, enactment date of the ADA." *Id.*[17] The DOL also noted that its opinion was consistent with the statutory purpose of providing "rehire benefits to employees adversely affected by the actions of an air carrier existing prior to the enactment of the ADA." *Id.* at 2. The court concludes that the DOL's position is reasonable and consistent with the language and purpose of the EPP.

Nevertheless, Northwest argues that Braniff, Inc.'s hiring of plaintiffs extinguished their rights of first hire under the EPP. Northwest contends that Braniff, Inc. meets the federal labor law criteria of successorship and, therefore, should be considered the same carrier as Braniff Airways for purposes of the rehire provisions.[18] The criteria relied on by Northwest has been applied to

15. Northwest contends that the DOL took an inconsistent position in a letter to USAir, Inc., dated June 2, 1989. In that letter, the DOL stated that "[a] designated employee who has obtained another job in his or her occupational no longer has any rehire rights." However, the question posed dealt with "designated employees who have obtained employment with another covered carrier or who have resigned from the other [covered] carrier." Thus, the court concludes that the DOL's earlier statement, when viewed in context, is not contrary to its current position. *Accord Crocker,* 933 F.2d at 1027 n. 5.

16. *Accord Gonzalez v. Aloha Airlines, Inc.,* 940 F.2d 1312, 1317 (9th Cir.1991) (subsequent employment with a noncovered airline does not extinguish a protected employee's right of first hire under section 43(d)).

17. Northwest asserts that this conclusion is clearly erroneous because the certificate previously held by Braniff Airways was transferred by order of the Board to Braniff, Inc. It is clear that the Board did not regard Braniff Airways and Braniff, Inc. as the same carrier. Instead, the Board deemed Braniff, Inc. a non-operating carrier seeking initial certification and undertook an independent investigation of the carrier's fitness. That the Board used the term "reissued" does not alter the fact that Braniff, Inc. was issued a certificate on February 24, 1984.

18. The criteria of successorship are: whether the second employer hires a majority of its employees from the predecessor's work force; "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987).

ensure industrial peace, to remedy unfair labor practices and to achieve the goals of Title VII. *See Fall River*, 482 U.S. at 43, 107 S.Ct. at 2236 (successor must bargain with union representing predecessor's employees); *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (successor responsible for predecessor's known unfair labor practices); and *Trujillo v. Longhorn Mfg. Co.*, 694 F.2d 221 (10th Cir.1982) (successor liable under Title VII for predecessor's discriminatory practices).

Plaintiffs respond that applying the successorship criteria to the EPP would frustrate its legislative purpose. The court agrees. "Congress intended to ensure that a dislocated protected employee obtain employment not merely with *any* air line but with one comparable to his previous employer, namely an established carrier that held a certificate before deregulation, and that the first-hire right therefore survive until the employee obtains such employment." *Crocker*, 933 F.2d at 1028 (emphasis in original). Accordingly, the court concludes that plaintiffs did not lose their first hire rights when they were hired by Braniff, Inc.

### 4. Applicable Statute of Limitations

■ Because Congress did not provide a statute of limitations for section 43(d), the court must borrow one from another source. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 158, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983); *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 146, 107 S.Ct. 2759, 2762, 97 L.Ed.2d 121 (1987). Ordinarily, it is presumed that Congress intended the courts to borrow the limitations period from the most analogous state law provision. *Agency Holding*, 483 U.S. at 147, 107 S.Ct. at 2762. The presumption is not absolute, however. A court should decline to borrow a state statute of limitations "when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle of interstitial law-

making." *DelCostello*, 462 U.S. at 172, 103 S.Ct. at 2294.

The exception recognized in *DelCostello* and its progeny is a narrow one. *Id.* at 171, 103 S.Ct. at 2294; *Reed v. United Transportation Union*, 488 U.S. 319, 324, 109 S.Ct. 621, 625, 102 L.Ed.2d 665 (1989). The Court emphasized that its holding in *DelCostello* "should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere," and that "resort to state law remains the norm for borrowing of limitations periods." *DelCostello*, 462 U.S. at 171, 103 S.Ct. at 2294. "[T]he mere fact that state law fails to provide a perfect analogy to the federal cause of action is never itself sufficient to justify the use of a federal statute of limitations." *Agency Holding*, 483 U.S. at 147, 107 S.Ct. at 2763. The Court has also made clear that "analogous state statutes of limitations are to be used unless they frustrate or significantly interfere with federal policies." *Reed*, 488 U.S. at 327, 109 S.Ct. at 627.

The proper source of the limitations period for actions under section 43(d) of the ADA is a question of first impression in the Eighth Circuit. Four circuit courts have considered the issue, with differing results. Three circuits have followed the longstanding practice of adopting the most analogous state statute of limitations. *See, e.g., Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1004–06 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 97, 121 L.Ed.2d 57 (1992); *Gonzalez v. Aloha Airlines, Inc.*, 940 F.2d 1312, 1314–15 (9th Cir.1991); *McDonald v. Piedmont Aviation, Inc.*, 930 F.2d 220, 224–25 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991). *Accord Crocker v. Piedmont Aviation, Inc.*, 696 F.Supp. 685, 689–92 (D.D.C.1988). The Third Circuit stands alone in holding that claims under section 43(d) of the ADA are governed by the 6 month statute of limitations contained in the National Labor Relations Act ("NLRA"). *Haggerty v. USAir, Inc.*, 952 F.2d 781, 783–88 (3d Cir.1992).

Northwest argues that actions under section 43(d) fall within the narrow exception requiring application of a federal statute of

limitations and urges the court to follow the Third Circuit's decision in *Haggerty*. Northwest asserts that a uniform federal statute of limitations is needed for claims under section 43(d). Northwest contends that because claims under section 43(d) are likely to affect the seniority rights and employment of other airline employees, the duty to hire provisions directly implicate federal labor policy. Northwest argues that the goals of uniformity and quick resolution of labor disputes require adoption of a relatively short statute of limitations. Northwest also contends there is a manifest need for uniformity because the airline industry is a uniquely nationwide industry. Northwest concludes that the court should deviate from the traditional practice of borrowing a limitations period from analogous state law and apply the 6 month limitation for unfair labor practice charges under section 10(b) of the NLRA.

The points raised by Northwest fail to convince the court that federal policy requires that section 10(b) of the NLRA govern claims under section 43(d) of the ADA. Congress enacted the EPP to ensure that airline employees who relied on the regulated system would not pay for the benefits of deregulation. Protection of airline employees is the keystone of section 43(d); the core purpose of the EPP is to affirmatively assist airline employees dislocated as a result of airline deregulation. The federal policy implemented by the EPP has no part in the design of a statute of limitations for unfair labor practice charges. Application of an analogous state statute of limitation neither frustrates nor significantly interferes with the federal policy of protecting airline employees. The court concludes that the federal interest furthered by section 43(d) does not make a federal rule significantly more appropriate than a state rule.[19]

The court holds that actions under section 43(d) do not fall within the narrow exception requiring application of a federal statute of limitations. The dispute in *Del-*

*Costello* directly affected the formation of a collective bargaining agreement and the private settlement of disputes under it. While actions under section 43(d) may impact the seniority rights of other employees, they do not directly affect industrial peace or the conduct of labor relations under a collective bargaining agreement. The 6 month statute of limitations was "crafted to accommodate federal interests in stable bargaining relationships and in private dispute resolution that are not squarely implicated" in section 43(d) actions. *See Reed,* 488 U.S. at 333, 109 S.Ct. at 630. Accordingly, the court joins the other federal courts that have applied analogous state statutes of limitations to actions under section 43(d).

Plaintiffs seek both reinstatement and back pay in this case. Northwest argues that regardless of the limitation period applied to the back pay claims, a six month limitation should apply to the claims for reinstatement due to the disruption such claims may have on Northwest's work force. While reinstatement of plaintiffs would disrupt the seniority rankings among Northwest's employees, it would not impact the collective bargaining process. Accordingly, the court concludes that the limitation periods for the claims of reinstatement as well as for back pay must be drawn from state law. The court notes, however, that in appropriate cases application of the doctrine of laches may shorten the limitation period for reinstatement claims under section 43(d).

Having decided to borrow a state statute of limitations, the next question facing the court is which Minnesota statute to apply. The parties suggest two possibilities, one generous and the other relatively short. Plaintiffs urge the court to apply the catchall limitations period of six years, applicable to actions "[u]pon a liability created by statute, other than those arising upon a penalty or forfeiture." Minn.Stat. § 541.05, subd. 1(2). Plaintiffs argue that because the EPP is a

---

**19.** *See McDonald v. Piedmont Aviation, Inc.,* 695 F.Supp. 133, 136 (S.D.N.Y.1988) (holding that the federal policy at stake under § 43(d)—protecting dislocated airline employees—did not make a federal statute of limitations significantly more appropriate than a state rule even though

the 6 month period under § 10(b) of the NLRA may provide a closer analogy and the practicalities of litigation against a multistate employer favor a uniform federal statute), *aff'd,* 930 F.2d 220 (2d Cir.1991).

remedial statute, the six year statute of limitations better serves federal policy than a shorter period. Northwest contends, however, that the most appropriate statute of limitations is the one year period applied to claims of unfair discrimination under the Minnesota Human Rights Act ("MHRA"). Minn.Stat. § 363.06, subd. 3.[20]

■ To decide which statute provides the most appropriate limiting principle, the court must first characterize the nature of the claim. *Wilson v. Garcia*, 471 U.S. 261, 268, 105 S.Ct. 1938, 1942–43, 85 L.Ed.2d 254 (1985).

> The characterization of [a federal claim] for statute of limitations purposes is derived from the elements of the cause of action, and Congress' purpose in providing it. These, of course, are matters of federal law.

*Id.* at 268, 105 S.Ct. at 1943. As discussed above, the EPP was created by Congress to protect certain airline employees from the potentially harsh repercussions of deregulation. The elements of a cause of action under the EPP are similar to the prima facie case applied in federal discrimination cases. *See Robinson v. American Airlines, Inc.*, 722 F.Supp. 757, 763 (D.D.C.1989), *aff'd*, 908 F.2d 1020 (D.C.Cir.1990). To establish a claim under the ADA, a plaintiff must show that: (1) he is a protected employee under the EPP; (2) he met the carrier's noncompetitive hiring prerequisites or qualifications, excluding initial hiring age, for employees in his occupational specialty; and · (3) the carrier failed to hire him before hiring any other

person except a protected employee or an employee furloughed by the carrier. *Id.*[21]

Actions under the ADA arise solely by virtue of the right created by section 43(d) and, thus, are based upon a liability created by statute. That similarity alone, however, does not establish that Minn.Stat. § 541.05, subd. 1(2) provides the most analogous statute of limitations. The gravamen of claims asserted under section 43(d) is the failure to hire a protected airline employee. The MHRA is a remedial statute which provides remedies for discriminatory failure to hire on the basis of improper factors, including sex, race, religion, age and marital status. The remedies sought by plaintiffs and envisioned by Congress are more analogous to remedies afforded to victims of employment discrimination. The elements of a cause of action under the EPP are kindred to a discrimination claim under the MHRA. The court holds that actions under section 43(d) are most closely akin to unfair discrimination actions under the MHRA.

Plaintiffs contend that applying a one year limitation period to claims brought under section 43(d) would thwart the substantive policies behind the EPP. The court recognizes that the adoption of the most analogous state statute of limitations cannot frustrate federal policy.[22] The court concludes, however, that a one year limitation period strikes a proper balance between protecting valid claims and prohibiting the prosecution of stale ones.[23] It also respects "the State's judgment on the proper balance between the policies of repose and the substantive policies of enforcement in the state cause of action."

---

**20.** Two of the former Braniff, Inc. pilots, Roger L. Duncan and Wayne T. Hoover have not applied for employment with Northwest since 1982; another former pilot, Henry Jackson, last applied for employment in 1985. Accordingly, the claims of those pilots are time barred regardless of the limitations period applied.

**21.** The Ninth and the Tenth Circuits have characterized claims under the EPP as most analogous to actions to enforce rights or liabilities created by federal statute. *Gonzalez*, 940 F.2d at 1315–16 (two years under Hawaii law); *Bowdry*, 956 F.2d at 1006 (two years under Colorado law). The Second Circuit has likened EPP claims to state law tort actions. *McDonald*, 930 F.2d at 225 (three years under Massachusetts law). One

district court has adopted a catchall limitations period applicable to claims arising under a statute. *Crocker*, 696 F.Supp. at 690 (three years under District of Columbia law).

**22.** *See Wilson*, 471 U.S. at 270 & n. 22, 105 S.Ct. at 1944 n. 22 (state authority is helpful, but "[s]tate law is applied only because it supplements and fulfills federal policy, and the ultimate question is what federal policy requires.") (quoting *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 709, 86 S.Ct. 1107, 1115, 16 L.Ed.2d 192 (1966) (White, J., dissenting)).

**23.** The court notes that Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–5(e), provides a six month limitations period.

*Wilson,* 471 U.S. at 271, 105 S.Ct. at 1944. Moreover, a one year statute of limitations does not subvert the purpose of the EPP, because, in general, a protected employee will realize when a covered carrier has violated its duty to hire and can promptly initiate an action against the carrier.

### CONCLUSION

The court concludes that the duty to hire under section 43(d) remains in effect and that Northwest, as a covered carrier, must continue to hire protected employees. The court also holds that plaintiffs' employment with Braniff, Inc. did not extinguish their first hire rights under the EPP. Finally, the court holds that the proper statute of limitations for plaintiffs' claims under section 43(d) is the one year period applied to discrimination claims under the MHRA. Northwest is entitled to summary judgment against 25 of the 41 plaintiffs because they failed to comply with the applicable limitation period.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. Northwest's motion to dismiss is denied; and

2. Northwest's motion for summary judgment granted insofar as the actions of certain plaintiffs are time barred; the motion for summary judgment is otherwise denied. Accordingly, summary judgment is granted in favor of Northwest against plaintiffs Howard Carr, E.R. Christian, August Draffkorn, Roger L. Duncan, Robert T. Freeman, Edward J. Godek, Edward S. Hodge, James C. Hook, Wayne T. Hoover, Henry Jackson, William H. Jackson, John O. Johnson, Donald Kelly, William J. Koberick, Jerry L. Myers, Roger Neale, Robert Nolden, Benny C. Reynolds, Paul E. Schueler, W. Don Shelby, Kenneth L. Sukla, Thomas Tweeddale, Richard R. Walker, Maynard D. Week, and Lewis Woolery. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court finds that there is no just reason for delay and directs that **JUDGMENT BE ENTERED** in favor of Northwest Airlines, Inc. against the 25 plaintiffs identified above.

The court also concludes that an immediate appeal from the other issues decided in this order will materially advance the ultimate termination of the litigation. The decision rendered by the court today involves a controlling question of law as to which there is a substantial ground for difference of opinion. *See, e.g., Long v. Trans–World Airlines, Inc.,* 913 F.2d 1262, 1265 (7th Cir. 1990). Pursuant to 28 U.S.C. § 1292(b), the court certifies this order for immediate appeal to the Eighth Circuit Court of Appeals. If the Eighth Circuit permits an appeal to be taken, the court will, upon proper motion, stay further proceedings in the district court.