**TRANS WORLD AIRLINES, INC., Appellant,**

**v.**

**The INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS, Appellee.**

**No. 86–1998.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1986.

Decided Jan. 14, 1987.

H. Kent Munson, St. Louis, Mo., for intervenor Glenda-Lopez-Bruner, et al.

Murray Gartner, New York City, for appellant, T.W.A.

Steven Fehr, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

The question presented in this case is whether the union security and dues check-off provisions contained in Article 24(A–L) of the 1983 collective bargaining agreement between TWA and The Independent Federation of Flight Attendants (Union) are now in effect and should be enforced.

On cross motions for summary judgment, the district court[1] granted summary judgment in favor of the Union and required TWA to implement the dues check-off and union security provisions of the collective bargaining agreement. 640 F.Supp. 1108 (1986). TWA on this appeal contends that the agreement has expired and that therefore it need not implement those provisions of the agreement. For the reasons set forth below, we affirm the summary judgment in favor of the Union.

## I. BACKGROUND

TWA and the Union entered into a collective bargaining agreement containing the following duration clause:

Except as otherwise specified in this Agreement, this entire Agreement shall be effective August 1, 1981 [and] shall remain in effect until July 31, 1984 and thereafter shall renew itself without change for yearly periods unless written notice of intended change is served in accordance with Section 6, Title 1 of the Railway Labor Act, as amended, by ei-

ther party hereto, at least 90 days prior to the renewal date in each year.

In 1984, notices of intended change were exchanged by the parties pursuant to section 6 of the Railway Labor Act (RLA), 45 U.S.C. § 156,[2] and the parties proceeded, under the auspices of the National Mediation Board (NMB), through the Act's mandatory statutory negotiation and mediation procedures. In January of 1986, TWA refused the NMB's offer pursuant to section 5 of the RLA, 45 U.S.C. § 155, of binding arbitration. The parties were released by the NMB and allowed to engage in self help as of March 7, 1986. On that date, the Union struck the airline and TWA implemented new working conditions, including abrogation of the union security and dues check-off provisions contained in Article 24(A–L) of the agreement. These provisions were not the subject of a section 6 notice in which TWA sought changes in the collective bargaining agreement.

On April 17, 1986, TWA filed this action in the district court seeking declaration that the collective bargaining agreement had expired and that TWA therefore was not obligated to observe the union security or related provisions, whether subject to negotiations or not. On May 17, 1986, the Union ended the strike and the flight attendants offered to return to work.

Thereafter, on August 1, 1986, the district court ruled on cross motions for summary judgment determining that TWA is required to implement the dues check-off and union membership provisions of Article 24 of the collective bargaining agreement.

---

**1.** The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

**2.** Section 156 reads:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended

change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title [45 U.S.C. § 155], by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156.

In its decision, the district court held that the collective bargaining agreement did not by its terms expire as to those provisions which had not been subject to reopening by the parties and that the provisions of the RLA prohibit a carrier from making a unilateral change in conditions which were not the subject of a section 6 notice. The district court rested its decision on both grounds.

In its analysis, the district court first assumed that the contract provisions terminated upon the parties reaching an impasse after attempting to resolve the disputes subsequent to the contract termination date of July 31, 1984. Assuming termination, the district court held that the provisions of the RLA require that those contract terms between the parties which are not subject to dispute continue to govern their relationship as to any terms not in dispute. Thus, because the union security clauses were never sought to be changed by TWA in its section 6 notice to the Union, those clauses not in issue, including the union security clause, continue to be effective in governing the rights of the employer and the Union.

As further ground for its judgment, the district court construed the durational language that "this entire agreement * * * shall renew itself without change for yearly periods" to mean that except for those contract terms subject to reopening, all other provisions of the contract remain in effect and control the rights and obligations of the parties.

TWA brings this appeal, arguing that the collective bargaining agreement has by its own terms expired and that the RLA does not prohibit the parties from fixing a term for expiration of the agreement after which time all provisions of the pre-existing collective bargaining contract, not expressly reviewed, are terminated.

TWA, in appealing the adverse judgment, also sought a stay of enforcement of the union security provisions pending appeal. We granted a partial stay on August 26, 1986, but upon submission of the case to the panel, on October 15, 1986, the majority of the panel dissolved that stay. We turn to the merits of the appeal.

## II. DISCUSSION

The district court stated the issues in the case as follows: (1) Did Article 28, the duration provision of the contract, cause parts of the contract that were not subject to bargaining to continue in effect, or did notice of certain intended changes trigger a total termination of the agreement? (2) Assuming the contract provided for total termination upon impasse over proposals for limited changes, is such a duration provision lawful under the Railway Labor Act?

As we have observed, the district court answered the first issue by holding that those parts of the contract not subject to bargaining did continue in effect. On the second issue, the court held that such a duration provision is unlawful under the RLA. Thus, TWA lost on both issues. In this opinion, we deem it appropriate to rest our decision on the first issue, that is, that the union security clause which was not the subject of reopening has not been terminated, and we need not address the second issue.

### A. Duration Clause

We construe the terms of the duration clause of this agreement in light of the national labor policy enunciated by the Railway Labor Act, which governs airlines as well as railroads, and, in light of pertinent decisions bearing on the issues.

The RLA was enacted with a number of purposes in mind:

(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settle-

ment of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a.

To enable the parties to a collective bargaining agreement to attain these goals, Congress has established mandatory, and "almost interminable," procedures which must be followed in settling disputes such as exist here. *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). Any party seeking to make changes in rates of pay, rules or working conditions of employees must file a notice pursuant to section 6 of the RLA, 45 U.S.C. § 156, and confer with the other party. 42 U.S.C. § 152, Seventh. If the parties are unable to resolve their dispute, they may invoke the services of the NMB or the Board may, in an emergency situation, proffer its services. 45 U.S.C. § 155, First. If the NMB is unsuccessful in helping to resolve the dispute, the Board must attempt to induce the parties to agree to arbitration. Said arbitration is not, however, mandatory. *Id.* If the dispute is not resolved under these provisions of the Act and the NMB finds the dispute should "threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the NMB must contact the President of the United States who may set up an Emergency Board to evaluate the dispute and report to him. 45 U.S.C. § 160. Throughout this period, the parties may not alter the status quo and no change may be made in those rates of pay, working conditions or rules which are the subject of the dispute. It is only after all statutory procedures have been exhausted that the parties may engage in self help.

Congress, in enacting these detailed procedures, sought "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, waste-ful strikes and interruptions of interstate commerce." *Detroit & Toledo Shore Line R.R.*, 396 U.S. at 148, 90 S.Ct. at 298 (footnote omitted). This detailed statutory scheme has bargaining as its major thrust. At the same time, it seeks to avoid any interruption in commerce. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969). The Act attempts to provide the parties with every opportunity to resolve their labor disputes through bargaining and negotiation.

The Supreme Court recognized the central role of bargaining and the continuity of the relationship between management and labor in industries subject to the RLA, in holding that where terms in a collective bargaining agreement have not been the subject of dispute, those terms continue to bind the parties. *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees, AFL–CIO v. Florida East Coast Ry. Co.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) (*FEC*). In *FEC*, during a strike over a wage increase and notice requirements prior to layoffs and job abolition, and after complying with the RLA's procedural requirements and entering the self help stage, the railroad resumed operations with a substantially different labor force with whose members it made individual employment agreements that were substantially different from the existing collective bargaining agreements. A number of the changes made by the railroad had not been the subject of a section 6 notice, nor had they been subject to RLA procedures. The Supreme Court held that given the public service nature of the business, *id.* at 244, 86 S.Ct. at 1423, and its responsibility to the public to maintain the public service at all times, *id.* at 245, the railroad could make only such changes as are truly necessary in light of the inexperience and lack of training of the new labor force or the lesser number of employees available for the continued operation. The collective bargaining agreement remains the norm; the burden is on the carrier to

show the need for any alteration of it, as respects the new and different class of employees that it is required to employ in order to maintain that *continuity of operation* that the law requires of it.

*Id.* at 248, 86 S.Ct. at 1425 (emphasis added). The Court further limited this power to change or revise the collective bargaining agreement by holding that it must be "closely confined and supervised" by the courts, *id.* at 246, 86 S.Ct. at 1424, recognizing that

> [t]hese collective bargaining agreements are the product of years of struggle and negotiation; they represent the rules governing the community of striking employees and the carrier. That community is not destroyed by the strike, as the strike represents only an interruption in the continuity of the relation. Were a strike to be the occasion for a carrier to tear up and annul, so to speak, the entire collective bargaining agreement, labor-management relations would revert to the jungle. A carrier could then use the occasion of a strike over a simple wage and hour dispute to make sweeping changes in its work-rules so as to permit operation on terms which could not conceivably have been obtained through negotiation. Having made such changes, a carrier might well have little incentive to reach a settlement of the dispute that led to the strike. It might indeed have a strong reason to prolong the strike and even break the union. The temptation might be strong to precipitate a strike in order to permit the carrier to abrogate the entire collective bargaining agreement on terms most favorable to it. The processes of bargaining and mediation called for by the Act would indeed become a sham if a carrier could unilaterally achieve what the Act requires be done by the other orderly procedures.

*Id.* at 246–47, 86 S.Ct. at 1424–25 (footnote omitted).

The Supreme Court thus recognized that bargaining is central to the RLA and that even the existence of a strike does not empower management to annul those terms of the collective bargaining agreement that had not been subject to prior bargaining.

The very words of TWA's reopener notice amply demonstrates that TWA itself has recognized the limited nature of its reopening of the collective bargaining agreement and that a notice to change is not a notice to terminate the agreement in the event an impasse is reached is strongly evidenced by the very words of TWA's reopener notice. In its letter of February 29, 1984, TWA proposed eliminating certain items of compensation, amending certain articles relating to expenses, credits and bidding procedures, and modifying certain other procedures. In its conclusion, TWA reserved the right to propose further "additions, deletions, modifications or other changes in the agreement * * * ". Letter from J.W. Hoar, Director/Technical & Contract Liaison, TWA, to Arthur Teolis, President, The Independent Federation of Flight Attendants (Feb. 29, 1984), in Affidavit of Counsel Attaching Certain Pertinent Portions of the District Court Record, Exhibit 3, Affidavit of William A. Jolley (Aug. 20, 1986). Nowhere does TWA suggest that failure to reach an accord would terminate the balance of the terms and provisions of the agreement.

Further, the affidavit of William A. Jolley clarifies the understanding of the parties as to the continuity of the terms of the collective bargaining agreement, including those terms not reopened. That affidavit, which is undisputed, states in part:

> 3. Since April 1, 1977 and continuing to date I have had numerous discussions with various TWA officials and representatives concerning interpretation of terms of the collective bargaining agreement, grievance handling, arbitrations and in the course of numerous collective bargaining negotiations sessions. At no time prior to receipt of an April 25, 1986 letter signed by J.W. Hoar have I ever heard any such official or representative of TWA refer to an "expiration" date of the collective bargaining agreement or speak in terms of that agreement "expir-

ing" or "terminating" or in any other way suggesting or implying that on or after March 7, 1986, TWA could or have the right to unilaterally implement or change terms of conditions of employment other than those which had been subject to Section 6 Notices and made the subject of collective bargaining. On the contrary, since April 1, 1977 and until April 25, 1986, TWA officials and representatives referred to the "amendable" date of the Agreement and spoke in terms of that Agreement "becoming amendable."

Affidavit of Counsel Attaching Certain Pertinent Portions of the District Court Record, Exhibit 3, Affidavit of William A. Jolley (Aug. 20, 1986).

TWA, in its claim that it is no longer bound by the union security clause, or indeed any other provision of the collective bargaining agreement, asserts that the contract came to a complete termination when the parties reached an impasse in their bargaining. Therefore, because the self help period has ended with the formal ending of the strike, TWA can disregard any provision of the previous collective bargaining agreement. TWA contends that the duration clauses analyzed by the Second, Seventh and Ninth Circuits support its view that the contract terms of an airline's collective bargaining agreement can expire and, comparing the present duration clause with those in other contracts, there exists no reasonable basis for concluding that the TWA–Union contract in issue here has not expired.

TWA relies principally on *EEOC v. United Airlines*, 755 F.2d 94 (7th Cir.1985); *IAM v. Reeve Aleutian Airways*, 469 F.2d 990 (9th Cir.1972); *Flight Eng'r Int'l Ass'n, EAL Chapter v. Eastern Airlines*, 359 F.2d 303 (2d Cir.1966); and *Manning v. American Airlines*, 329 F.2d 32 (2d Cir. 1964). In further support of the *Reeve* case, TWA cites *IAM v. Aloha Airlines*, 776 F.2d 812 (9th Cir.1985) and *IAM v. Quantas Airways*, 122 L.R.R.M. 2263 (N.D.Cal.1985).

In our view, *EEOC v. United Airlines*, decided by the Seventh Circuit, does not support TWA's position. Indeed, Judge Posner's opinion seems to reject the central thesis of TWA's analysis in construing the duration clause at issue there as creating an amendable, not a terminable, contract. Nor does the Second Circuit's opinion in *Manning* support TWA's position. *Manning* dealt with a dues check-off agreement that was specifically excluded from the contract's automatic renewal clause. The Second Circuit held that the check-off provision was a "working condition" within the meaning of section 6 of the RLA, thus coming within the status quo provisions of section 6. The clause, therefore, could not be unilaterally abrogated by the airline. In *Manning*, the parties agreed that the check-off provision expired on April 30, 1963, and that the provision did not come within the general renewal provision of the contract. Nevertheless, the provision remained in effect subject to the application of section 6 of the RLA, requiring written notice of change, bargaining and mediation. The *Manning* court at no time addressed whether or not contract terms not subject to reopening and bargaining would automatically expire on impasse.

Two other Second Circuit cases cited by appellant are not especially revealing. In *Air Cargo Inc. v. Local Union 851*, 733 F.2d 241 (2d Cir.1984), the court considered and decided that the status quo provisions of section 6 required that the union maintain the actual working conditions of an organization performing work for an air carrier. While the court referred to the expiration of the agreement in that case, the discussion does not indicate that the contract between the union and the employer contained a duration clause providing for automatic renewal as in the airline contract at issue here. TWA's citation of the *Eastern Airlines* case is equally without persuasive effect. Nowhere in that opinion does the Second Circuit discuss the precise issue before us even though that court agreed with the trial court that the underlying collective bargaining agreement between the parties had terminated. That

case concerns itself with issues that were the subject of much controversy among the parties and over which the parties had engaged in sustained bargaining and mediation. The case does not deal with provisions of the contract which were not in dispute. Moreover, the *Eastern Airlines* opinion does not discuss the policy considerations cited in *FEC*, inasmuch as it predates *FEC*.[3] Thus, TWA's position that on impasse all provisions of the collective bargaining agreement terminate rests essentially on a comparison of the duration clause in the instant litigation with that at issue in *Reeve* and the acceptability of *Reeve* as persuasive authority here.

The *Reeve* case and its progeny, including *Aloha* and *Quantas*, directly hold that airline contracts similar, but not identical, to the TWA contract here in issue come to an end upon impasse and, following a strike and self help period, the airline employer may change those working conditions which had not been proposed for change or bargained over. The agreement in *Reeve* read:

> This agreement shall become effective November 1, 1966, and shall continue in full force and effect until April 1, 1968, and shall renew itself without change until each succeeding April 1st thereafter, unless written notice of intended change is served in accordance with Section 6, Title 1, of the Railway Labor Act, as amended, by either party hereto at least sixty (60) days prior to April 1st in any year after 1967.

469 F.2d at 991. The opinion in the Ninth Circuit quotes and affirms the district court's statement that:

> The terms of the agreement called for its termination on the first day of April following notice by *either* party of intended changes. It is irrelevant that the defendant [Company] never served notice

of any intended changes, and it is of no consequence that only portions of the contract were subject to negotiation. The contract expired by its own terms on April 1, 1968.

*Id.* at 992–93.

An examination of the district court opinion suggests that the parties did not present the issue of contract interpretation to the district court, for its opinion stated that "[t]he sole issue presented is whether the Railway Labor Act, 45 U.S.C.A. § 151 *et seq.*, has the effect of extending a collective bargaining agreement beyond the termination date specified in the agreement." 330 F.Supp. 332, 333–34 (D. Alaska 1971). Moreover, the district court's discussion indicates that the union predicated its claim for relief solely on the *FEC* case, not on the contract terms. *Id.* at 334. The district court distinguished *FEC* on grounds that *FEC* related to unexpired agreements. The district court, without citation to any authority in cases under the RLA, stated "[a]s a matter of law, the contract expired by its own terms * * *." *Id.* at 335.

Neither the district court opinion nor the Ninth Circuit opinion in *Reeve* gives any detailed consideration to construction of the renewal clause in a manner consistent with the policies of the RLA and the core language of *FEC* that requires stable and continuing agreements between management and labor.[4] We emphasize that core language in *FEC*:

> These collective bargaining agreements are the product of years of struggle and negotiation; they represent the rules governing the community of striking employees and the carrier. That community is not destroyed by the strike, as the strike represents only an interruption in the continuity of the relation. Were a strike to be the occasion for a carrier to tear up and annul, so to speak, the entire

---

3. Both sides seem to derive some comfort from *Air Line Pilots Ass'n Int'l v. United Air Lines,* 802 F.2d 886 (7th Cir.1986). This case does not cast much light on the issue before us but at least in theory seems to support the union's position. The issue in that case focused on the court's obligation "to ascertain whether the various self-

help measures employed by both United and ALPA unlawfully impinged upon statutory protections provided under the RLA." *Id.,* at 896.

4. We note that *Reeve* relied on *Eastern Airlines* which, as we have observed, antedated *FEC.*

collective bargaining agreement, labor-management relations would revert to the jungle.

384 U.S. at 246–47, 86 S.Ct. at 1424–25 (footnote omitted). Moreover, the Ninth Circuit opinion gives no consideration to what the Supreme Court referred to as the spirit of the Act:

> While the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored.

*Id.* at 247, 86 S.Ct. at 1425 (footnote omitted).

We will not follow the *Reeve* rationale in this case.

The district court noted in the present case that as to contract interpretation, the *Reeve* case is subject to question—realistically, the July 31, 1984 date is not a termination date at all but it is a date that serves as a measuring point for the ninety-day notice required prior to the making of intended changes to the contract. On this issue of contract interpretation, District Judge Sachs wrote further:

> In *EEOC v. United Air Lines, Inc.*, 755 F.2d 94 (7th Cir.1985), Judge Posner avoided a ruling flatly disapproving of the *Reeve* decision, 469 F.2d 993 [sic], by construing the duration clause in the airline contract before him as creating an amendable rather than a terminable contract. The language under consideration specified that the agreement "shall remain in full force and effect through November 1, 1978, and thereafter shall be subject to change by service of a notice as provided for in Section 6" of the Railway Labor Act. 755 F.2d at 97. Although the district court had concluded that the contract had terminated in its entirety, the Seventh Circuit disagreed. The appellate ruling was that "the service of the notice is the mode of amendment, *implying* that what is not sought to be changed continues in effect. November 1 really is not a termination date

at all; it is the date before which no changes can be made." *Id.* (Emphasis added.)

The opinion continues:

> The present contract contains a duration clause providing:
>
> > Except as otherwise specified in this Agreement, this entire Agreement shall be effective August 1, 1981 [and] shall remain in effect until July 31, 1984, and thereafter shall renew itself without change for yearly periods unless written notice of intended change is served in accordance with Section 6 ... of the Railway Labor Act by either party hereto, at least 90 days prior to the renewal date in each year.
>
> This language shows that a *total* renewal occurs if no notice is received. As in *EEOC*, there is no express language terminating the agreement in the event of a notice of intended change. While the notice prevents total renewal, nothing in the wording prevents partial renewal. On the contrary, partial renewal seems implied in the language preventing renewal of the "entire" agreement. The reference to the "entire" contract is useless, by the TWA interpretation, and merely serves as emphasis. It is more likely that it has an operative purpose, distinguishing between all or parts of the agreement. The language appears to create an amendable contract, as in *EEOC*, with prospective changes limited to the subject matter of the notice (footnote omitted).

Judge Sachs concluded:

> The contract in question is amendable in accordance with its provisions and the Railway Labor Act. It does not wholly terminate, either automatically or upon service of notice of a limited number of intended changes. The union security provision continues in effect, * * *.

We agree with the district court's construction of the contract.

The RLA, in its application to the airlines and to this contract, which has a forty-year history, represents a day when stability in

labor relations represented the norm in the public transportation industries. While we take judicial notice that labor relations in the airline industry have entered a different era, one of strife and turmoil resulting from deregulation and takeovers by "corporate raiders," the underlying statute and the contract language that was written in a manner consistent with the RLA still requires a construction which emphasizes continuity in existing relationships between management and labor, except where either side has requested a change. In the latter event, the proposed change must be the subject of collective bargaining.

## B. Dues Check-Off Provision

TWA argues that a dues check-off provision is purely a creature of contract and thus is of a special nature such that once the parties have bargained to impasse over any disputed provisions in the agreement, nothing in the RLA requires continuation of the check-off provision in the absence of an integrated labor agreement. We disagree.

■ As both parties agree, a dues check-off provision is purely a creature of contract. Section 2, Eleventh, of the RLA allows inclusion of such a clause in collective agreements and, as TWA concedes, continuation of the provision through the status quo period is consistent with the policies reflected in section 6 of the RLA. TWA, however, contends that once all statutory procedures have been exhausted, no purpose of the RLA is served by continuing the dues check-off provision in effect, as such regulation of the relationship between the union and its members is lawful only by virtue of the collective agreement.

TWA supports this argument by reference to *NLRB v. Haberman Constr. Co.,* 618 F.2d 288, 302–03 n. 16 (5th Cir.1980), *modified on other grounds,* 641 F.2d 351 (5th Cir.1981), a case arising under the National Labor Relations Act (NLRA). There the Fifth Circuit recognized that union security provisions do not survive expiration of a contract even though provisions governing terms and conditions of employ-

ment generally do survive expiration of an agreement and may not be changed until the parties have bargained to impasse.

*Haberman,* however, is not persuasive. The Fifth Circuit reviewed a contract governed by the NLRA and therefore did not discuss *FEC* or the general policies of the RLA. While cases under the NLRA may be instructive, the contract at issue here is under the RLA and must be evaluated in light of its policies, which are in some respects unique to the RLA and those industries subject to its provisions. As the Supreme Court recognized in *FEC, supra,* the importance of the industry's public service nature, and its responsibility to maintain that service, warrants special rules. One of those rules is that if a working condition has not been subject to the procedures of the Act, it may not be changed even after expiration of the status quo period unless truly necessary for the continued operation of the airline. *FEC,* 384 U.S. at 248, 86 S.Ct. at 1425–26.

In *Cox v. Northwest Airlines,* 319 F.Supp. 92 (D.Minn.1970), the district court emphasized the importance of *FEC* to the maintenance of labor relations under the RLA and noted that the policies enunciated by the Court in *FEC* rise above any interpretation of the language of a collective bargaining agreement:

[T]he arguments advanced by the [*FEC*] Court for protecting the integrity of the collective bargaining agreement and the parade of horrors which the Court feels would result from a failure to do so, are not dependent upon or affected in any manner by an interpretation of the * * * collective bargaining agreement. That this is quite clearly the case is emphasized by the fact that the court clearly held that Section 2 Seventh does not apply during a strike and relied upon the overall thrust of the Railway Labor Act as a rationale for limiting departure from the terms of the collective bargaining agreement. The Court said: "[The carrier's] power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Rail-

way Labor Act is to be honored." It can hardly be seriously asserted that the "spirit" of the Act is determined by language selected by the draftsmen of * * clauses in collective bargaining agreements.

*Id.* at 98 (footnote omitted). We agree.

■ TWA does not dispute that the Union remains the recognized collective bargaining agent for the flight attendants. Clearly, if the Union is to represent the flight attendants, it needs to collect dues, and enforcement of the check-off provision is integral to that process. Moreover, dues check-off is recognized as a working condition under the RLA. *Manning,* 329 F.2d at 34–35. Because the contract at issue here continues in effect as to provisions other than those subject to notice of intended change, no reason exists for automatic abrogation of the check-off provision upon the parties reaching an impasse. The provision was never reopened as a subject for bargaining; nor has TWA demonstrated how its termination is necessary to TWA's continued operation. While we recognize that there are existing disputes between various employees, *e.g.,* over the seniority rights of cross-over employees as opposed to newly hired employees, these are not concerns of TWA but are for the union to deal with in carrying out its responsibility to represent all union members.

## III. CONCLUSION

In sum, to read the duration clause in the manner TWA suggests would completely undermine the collective bargaining nature of the Act. The only way to effectively achieve the goals of the Railway Labor Act is to require the parties to negotiate and mediate over those changes they wish to make. The TWA–Union duration clause was written to facilitate such negotiation and mediation. It is not for this court to rewrite the clause in the way TWA now wishes it was written, and to do so in this case would cut out the very heart of the Railway Labor Act—collective bargaining.

In light of our holding that the agreement at issue has not expired,[5] the Supreme Court's decision in *FEC* is controlling here. As discussed above, TWA may only make those changes "as are truly necessary in light of the inexperience and lack of training of the new labor force or the lesser number of employees available for the continued operation" of the airline. *FEC, supra,* 384 U.S. at 248, 86 S.Ct. at 1425. Thus, for the reasons we have stated, we affirm the judgment of the district court.

We add this comment concerning TWA's position. To read the clause as proposed by TWA frustrates the basic purpose of the RLA. An airline employer, such as TWA, may flout the entire purpose of the RLA by not filing a section 6 notice with regard to certain changes it intends to make. Under such circumstances, the carrier may hide its true intention to make certain changes so that the change is never negotiated and the NMB never has the opportunity to mediate the dispute. This leaves the carrier free to unilaterally change a condition of employment, here the extremely important condition of union security, without ever having to negotiate, mediate or arbitrate the dispute. There is simply nothing in the duration clause at issue here which leads this court to conclude that the parties intended a result so at odds with the RLA. Against this backdrop, we believe the district court correctly decided the effect of the duration clause.

Affirmed.

5. In view of our holding that the terms of the collective bargaining agreement not reopened still remain in effect, it is unnecessary for us to address whether or not the RLA permits agreements of fixed duration.