John W. ACKERMAN; Darrell F. Alessi; Gary Alleman; Richard A. Brannock; Ronald G. Brown; Lloyd D. Bryant; Robert W. Burk; Howard Carr; E.R. Christian; Dale Cross; Thomas E. Davis; August Draffkorn; Roger L. Duncan; Robert T. Freeman; William D. Freeman; Arbie J. Gest; Edward J. Godek; William Good; Edward S. Hodge; James C. Hook; Estate of William H. Jackson; John O. Johnson; James B. Jones; Frank J. Kaberna; Donald G. Kelly; William J. Koberick; Richard D. Luthi; Jerry L. Myers; Roger Neale; Robert Nolden; Benny C.

---

Reynolds; W. Don Shelby; Paul E. Schueler; Kenneth L. Sukla; Thomas Tweeddale; Richard R. Walker; Maynard D. Week; Robert L. Williams; Lewis Woolery; Gerald Stack, Plaintiffs–Appellees,

v.

NORTHWEST AIRLINES, INC., a foreign corporation, Defendant–Appellant.

No. 94–2657.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1995.

Decided May 15, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied June 26, 1995.

John J. Gallagher of Washington, DC, argued (Margaret H. Spurlin, Kenneth M. Willner, Thomas W. Tinkham and Perry M. Wilson, on brief), for appellant.

Carl H. Hoffman, Coral Gables, FL, argued (Stuart A. Goldstein and Stephen D. Gordon, on brief), for appellee.

Before MAGILL, LOKEN, and MURPHY, Circuit Judges.

DIANA E. MURPHY, Circuit Judge.

John Ackerman and thirty-nine other pilots who were furloughed by Braniff Airways, Inc. in 1982 sued Northwest Airlines, Inc. (Northwest) for not hiring them pursuant to the Employee Protection Program (EPP) of

the Airline Deregulation Act. 49 U.S.C. §§ 42101–06.[1] The district court denied Northwest's motion for summary judgment or dismissal, but certified three issues for interlocutory appeal under 28 U.S.C. § 1292(b). The certified questions relate to the district court's conclusions that the EPP is still in force, that pilots hired by Braniff, Inc. in 1984 retained their rights under the EPP, and that a one year statute of limitations applies. On appeal Northwest disagrees with these conclusions. We affirm in part and reverse in part.

When Congress passed the Airline Deregulation Act of 1978, it included the EPP to soften the effects of deregulation on airline employees. The EPP provided that any employee of a certificated airline for four years as of October 24, 1978, who was furloughed or terminated during the ten years after that date, became entitled to a right of first hire at other certificated airlines. The statute also envisioned monthly compensation for displaced employees, but the compensation program was never funded by Congress. See generally Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987).

Plaintiffs had been pilots for Braniff Airways, Inc. (Braniff I) for at least four years in October 1978.[2] Braniff I furloughed the plaintiffs when it and its parent corporation, Braniff International, declared bankruptcy in May 1982. During the next two years, Braniff I reorganized under Chapter 11 and was renamed the Dalfort Corporation. Braniff, Inc. (Braniff II) was created as a new subsidiary of the Dalfort Corporation (Braniff I) to operate a domestic airline. Braniff International ceased to exist for purposes relevant here. Braniff II began flight operations in 1984 and eventually hired less than half of the pilots laid off by Braniff I, including most or all of the plaintiffs. Braniff II was ultimately unsuccessful and declared bankruptcy

in October 1989. When Braniff II ceased operations, the plaintiffs were laid off again.

The plaintiffs all applied to Northwest one or more times between May 1982 and November 1992. Roughly two-thirds of them sought jobs at Northwest after Braniff I furloughed them in 1982. Three-quarters applied to Northwest within one year of the Braniff II failure in 1989. Half of the pilots applied to Northwest at least once during 1991 and 1992. All claim that they informed Northwest of their alleged first hire rights when they applied. Northwest hired none.

On October 30, 1992 Ackerman and most of the other plaintiffs filed identical actions in the District of Columbia against Northwest, American Airlines, Inc., Delta Air Lines, Inc., United Air Lines, Inc., and USAir, Inc. Plaintiff Gerald Stack filed an individual case there against all five airlines. On Northwest's motion, the Ackerman case was transferred in April 1993 to the District of Minnesota under 28 U.S.C. § 1404(a). Later Stack's claim against Northwest was severed from the rest of his action, transferred to Minnesota, and consolidated with the Ackerman case. The plaintiffs unsuccessfully petitioned the Judicial Panel on Multidistrict Litigation to consolidate this case and those against the other airlines for pretrial proceedings under 28 U.S.C. § 1407.

The district court denied Northwest's motion to dismiss or for summary judgment in an April 5, 1994 order dealing with a number of issues. Ackerman v. Northwest Airlines, Inc., 848 F.Supp. 880 (D.Minn.1994). Relying largely on a Department of Labor letter, the court concluded that the right of first hire continues. It also decided that employment by Braniff II did not terminate the plaintiffs' first hire rights. Finally, the district court applied the one year statute of limitations from the Minnesota Human

---

**1.** The EPP was formerly codified at 49 U.S.C.App. § 1552. Because the recodification at §§ 42101–06 was not intended to make any substantive changes, as discussed below, the recodified statutory references and language are used in this opinion unless otherwise indicated.

**2.** It appears from the record that one of the plaintiffs, Darrell F. Alessi, may not have been a

Braniff I pilot for four years as of October 1978. His name does not appear on a list of Braniff I pilots hired before October 24, 1974; the list was compiled for the Department of Labor by the Air Line Pilots Association. The complaint alleges that Alessi was a pilot for Braniff as of that date, but Northwest later stated on information and belief that he was not a Braniff I pilot.

Rights Act (MHRA), Minn.Stat. § 363.06, subd. 3., and found that the claims of twenty-five of the plaintiffs were time barred. The April order was later amended in an unpublished May 13, 1994 order, which concluded that a cause of action under the EPP arises not on the date of application for employment, but when an airline hires someone without first hire rights. Because of this conclusion, which is not disputed on this appeal, the claims of the twenty-five plaintiffs were reinstated.

The trial court certified the legal issues— the longevity of the EPP, the consequences of employment by Braniff II, and the statute of limitations—for appeal to this court under 28 U.S.C. § 1292(b). It stated that the three issues pose questions of law as to which there are substantial grounds for differences of opinion and that their immediate resolution would advance the termination of the litigation. 848 F.Supp. at 890. The appeal raises dispositive issues of law which are also the subject of litigation elsewhere.[3] Since the issues are questions of law, the standard of review is de novo.

## I.

Northwest argues that the district court erred in concluding that the plaintiffs' first hire rights continued after October 23, 1988. Northwest contends that it had no duty to hire any displaced employees after that date because the statute and regulations had lapsed.

The EPP contains an explicit sunset provision which provides that it "is not effective after the last day the Secretary of Labor must make a payment under this subchapter." 49 U.S.C. § 42106. The payments referenced by the section relate to the financial assistance provisions of § 42102. These provisions include the monthly assistance program that was never funded by Congress, and the Secretary of Labor has never made any payment and likely never will.

The implementing regulations also define the "effective period" for the duty to hire provision of the EPP:

> Effective period means the period commencing on the effective date of these regulations and ending on the later of: (1) October 23, 1988, or (2) the last day of the final month in which the Secretary is required to make a payment under section 43 of the Act; except that nothing in these regulations shall preclude the exercise of statutory rights and duties between October 24, 1978 and the effective date of these regulations.

29 C.F.R. § 220.01(g). The first hire "program and these regulations terminate on the last day of the effective period." 29 C.F.R. § 220.50.[4]

Northwest argues that since the Secretary has never made a payment, the life of the statute must be measured by the specific date in § 220.01, that is October 23, 1988. It concludes the EPP expired on that date. Both the statutory sunset provision and the regulation are susceptible of a different interpretation, however. The plaintiffs urge that if the financial assistance portion is never funded, the right of first hire continues indefinitely because the "later" of the two events mentioned in the regulation would not yet have occurred.[5]

---

3. Northwest earlier sought summary reversal of the district court on the basis of a decision in the Northern District of Georgia now on appeal to the Eleventh Circuit. *Ackerman v. Delta Air Lines, Inc.*, No. 1:93–CV–0973–JOF, slip op. (N.D.Ga. September 30, 1994). The Georgia court concluded that recall by Braniff II extinguished all first hire rights gained when Braniff I ceased operations. *Id.* at 14–15. Northwest argued that thirty-three of the plaintiffs before this court should be collaterally estopped from claiming that Braniff II employment did not extinguish their first hire rights. We denied the motion for summary reversal, but received the parties' submissions on the motion as supplemental briefs on the appeal. Because of our determination on the merits, we need not reach the issue of collateral estoppel.

4. Regulations regarding the financial assistance program have not been promulgated.

5. Two circuit courts have addressed the longevity of the duty to hire, reaching opposite conclusions, but neither case contains a reasoned analysis. *Haggerty v. USAir, Inc.*, 952 F.2d 781, 785 (3rd Cir.1992) (the duty to hire "was designed to be in effect for only ten years."); *Crocker v. Piedmont Aviation, Inc.*, 933 F.2d 1024, 1026 (D.C.Cir.1991) ("the EPP itself imposes no limits on the length of a protected employee's first-hire right"). The failure to hire alleged by plaintiffs in both cases occurred before October 1988.

An examination of the statute as a whole suggests that it is more likely that Congress intended that the duty to hire displaced employees continue beyond October 1988. The statute states that an employee who is furloughed or terminated other than for cause before October 23, 1988, is entitled to a right of first hire. 49 U.S.C. § 42103. One exception permits an airline to hire its own furloughed employees first, however. *Id.* An airline also need not hire a protected employee if it has no openings in a particular specialty. For these reasons it could be some time before an airline would have an opening in a displaced employee's specialty. If the statute is to fulfill Congress' intent that protected employees be hired by certificated carriers, there must therefore be time available for a protected employee to locate suitable employment. Under Northwest's interpretation of the statute, a protected employee furloughed on October 22, 1988, would have had one day to exercise his first hire rights. Such an interpretation would result in the creation of a right without an effective remedy.

If Congress had funded the financial assistance program, the duty to hire would have continued beyond October 1988. Because the sunset provision references compensation payments made by the Secretary of Labor, the duty to hire would have continued until the Secretary had made all required payments. Employees would have been entitled to payments for up to seventy-two months. 49 U.S.C. § 42102(b). Because a "qualifying dislocation" could have occurred as late as December 31, 1988, the right to receive compensation payments under the statutory framework could have continued until the end of 1994.

The legislative history also evinces a strong congressional commitment to the EPP. The Senate Committee on Commerce, Science, and Transportation noted that "Congress, on behalf of the American people, must insure that the benefits to the public which result from its decision to alter substantially the regulation of air transportation are not paid for by a minority—the airline employees and their families who have relied on the present system." *See* S.Rep. No. 631,

95th Cong., 2d Sess. 114 (1978) (Senate Rep.). The duty to hire program was intended to insure that "few such employees would be without work for a long period of time." *Id.* at 116. Although the legislative reports at the time of passage do not explicitly state the EPP should continue for a certain length of time, they do demonstrate significant congressional concern for the welfare of displaced employees. This commitment was forcefully demonstrated by rejection of a Senate amendment to remove the EPP by an 85–7 margin. 124 Cong.Rec. 10679 (1978); *see generally Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 691–96, 107 S.Ct. 1476, 1483–86, 94 L.Ed.2d 661 (1987).

The parties dispute the relevance of the recent recodification of the EPP. Pub.L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1158, codified at 49 U.S.C. §§ 42101–06. Plaintiffs argue that the recodification shows that Congress intends for enforcement of the EPP duty to hire provision to continue. They point out that in the recodification, "superseded, executed, and obsolete laws have been eliminated." Northwest counters that little can be inferred from the recodification because not all expired legislation was deleted. As an example, Northwest points to the retention of what is now 49 U.S.C. § 42104(c) (formerly § 1552(f)(3)). That subsection of the EPP, which contained a legislative veto provision, was held unconstitutional in *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 691–96, 107 S.Ct. 1476, 1483–86, 94 L.Ed.2d 661 (1987).

We hesitate to place much significance on the recodification, but it is entitled to some consideration. Congress did remove some chapters when it recodified Title 49, but it did not delete the EPP. The adopted version also included editorial changes. Although changes in the EPP were not intended to alter the substance of the law, *see Finley v. United States,* 490 U.S. 545, 553–56, 109 S.Ct. 2003, 2009–11, 104 L.Ed.2d 593 (1989), their existence implies some understanding that the EPP continues in force.

Finally, the Department of Labor (DOL) has indicated that the duty to hire is still effective. In a letter to Alaska Airlines on November 8, 1991, the DOL stated:

[T]he Rehire Program administered by the Department of Labor under the [Act] will remain in effect indefinitely to allow the Department time to conduct an internal and inter-Departmental review of policy options. Until further notice, ... all covered carriers must continue their duty to hire designated protected employees.

Northwest believes the DOL letter is not entitled to any deference. It points to the Supreme Court discussion of informal agency statements in *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976):

We consider the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts may properly resort for guidance. The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [65 S.Ct. 161, 164, 89 L.Ed. 124] (1944)).

The Court noted that opinions issued near the time of enactment should be given more attention. *Id.* at 142, 97 S.Ct. at 411.

There is reason to believe this letter may be consulted for guidance. Although it was not contemporaneous with the passage of the EPP, it apparently was written at the time when airlines became concerned about the ambiguity in the sunset provisions and requested a clarification from the department. The department's reasoning is consistent with common sense—premature suspension of the program would not permit study of

experiences under the statute and possible recommendations for the future. The department letter reflects the statute's concern for the protected employees.

■ Northwest also argues that the November 1991 DOL letter contradicts an earlier department opinion in a letter to Alaska Airlines on December 11, 1990. That letter stated:

[T]he Rehire Program administered by the Department of Labor under the [EPP] will remain in effect until October 23, 1991. During this period, the Department intends to publish in the *Federal Register* an Advance Notice of Proposed Rulemaking proposing the termination of this agency's involvement in the Airline Rehire Program.... [6]

Although the two letters show some inconsistency, they are consistent in reflecting that the duty to hire continued beyond 1988. The statements are not controlling here, but they are entitled to some consideration. *See also* Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 3.5, 119–23 (1994).

■ Consideration of the statute, the legislative history, and the DOL positions leads to the conclusion that the duty to hire provision of the EPP did not expire in 1988 and that Northwest had a continuing duty to hire protected employees through the period relevant here.[7]

## II.

After Braniff I declared bankruptcy in 1982, it reorganized under Chapter 11. As part of the reorganization a subsidiary, Braniff II, was incorporated to operate the domestic airline which hired the plaintiffs. Under the EPP, an employee loses his first right of hire if he is rehired by his "former carrier."

---

**6.** The proposed regulations were apparently never published.

**7.** We need not decide in this case whether the duty to hire continues indefinitely or what might cause it to expire other than further congressional action. We note, however, the possibility that the duty could have ended on December 31, 1994, seventy-two months after the Secretary might have begun making the last series of payments. *See* 49 U.S.C. §§ 42101(a), 42102(b),

42106. In any event, protected employees must have been employed by a carrier for four years prior to 1978, and the duty to hire is ongoing. The eligible pool is therefore narrowing and aging, and the duty to hire will eventually end. As carriers satisfy their statutory obligations, the number of eligible employees decreases since the right of first hire is extinguished when a protected employee is hired by a certificated carrier.

29 C.F.R. § 220.10(c).[8] Northwest argues that the district court erred when it found that Braniff II was not plaintiffs' former carrier and that their rights of first hire were not extinguished when they were hired by Braniff II in 1984. The plaintiffs argue that employment with Braniff II could not extinguish their first hire rights because the carrier did not have a certificate as of 1978 as required by the EPP.

Northwest points to many similarities between Braniff I and Braniff II. They used the same hub, Dallas/Fort Worth, and the same aircraft, which Braniff II leased from a liquidating trust of the Dalfort Corporation, the renamed Braniff I. Most significantly, the employees of Braniff I and Braniff II overlapped considerably. Substantially all of Braniff II's employees had worked for Braniff I. During the reorganization, Braniff I negotiated the contracts under which employees worked at Braniff II. Pilots were offered employment at Braniff II in "recall" letters in order of their seniority at Braniff I. They were not required to serve the customary probationary period or to have a physical examination.

On the other hand, plaintiffs point to several differences between the two Braniffs. Braniff II was significantly smaller. It initially employed only one-fifth as many pilots. It flew to fewer cities and had no international routes. Braniff II had new top management, a new capital structure, and new ownership. Its general business strategy was different, including new business class service not offered by Braniff I. Braniff II also paid pilots significantly less than they had earned at Braniff I, and pilots lost their seniority accumulated at Braniff I.

The similarities between the two entities and the fact that Braniff II was a subsidiary of the renamed Braniff I outweigh the differences. Although Braniff II was undoubtedly a new legal entity, *In re Braniff, Inc.*, 110 B.R. 980, 985 (Bank.M.D.Fla.1990), it was an outgrowth of Braniff I. If Braniff I had reorganized in the same manner, but had

resumed flight operations itself rather than creating Braniff II, the pilots clearly would have been recalled by their "former carrier" for the purposes of the EPP. Any changes in financing, ownership, size, and employee benefits would have been insufficient to overcome this conclusion. The simple creation of a subsidiary should not change that result.

■ Northwest also argues that labor law successorship principles should control the issue, but a wholesale adoption of those principles is unnecessary. The successorship principles have emerged in National Labor Relations Board cases considering when an employer must honor the labor obligations of another entity. *See Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). In determining whether there is "substantial continuity" between the two enterprises, the board and the courts consider:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*Id.* at 43, 107 S.Ct. at 2236. There were many similarities in working conditions at Braniff I and II, as noted above, including that plaintiffs were flying some of the same planes over some of the same routes. There were changes in employee rights, benefits, and compensation between the two Braniffs, but those changes were negotiated by Braniff I with the same union that had represented the pilots at Braniff I. Any differences in plaintiffs' employment at Braniff II therefore likely resulted from the very negotiations that successorship principles are designed to protect.

Plaintiffs argue that the close corporate relationship and the similarities between the two Braniffs should not control the result because Braniff II did not hold a certificate

---

8. 29 C.F.R. § 220.10(c) reads:

A designated employee who is recalled by his former carrier is no longer eligible under this section to exercise the right-of-first-hire. Such

a person may become a designated employee in the future due to a subsequent termination or furlough which occurs on or prior to the expiration of the eligibility period.

issued before the EPP took effect in 1978. Under § 42103, a protected employee does not lose his right of first hire until he is hired by a carrier which held a certificate prior to October 24, 1978.[9] While Braniff I held such a certificate, Braniff II technically did not. On December 5, 1983, Braniff I applied to the Civil Aeronautics Board (CAB) for a transfer of its certificate to Braniff II. On February 9, 1984, the CAB "transfer[red] the certificate of Braniff Airways, Inc. for Route 9 to Braniff, Inc." *Braniff, Inc., Fitness Investigation,* 106 C.A.B. 1, 2 (February 9, 1984).[10] The certificate was "reissue[d]" to Braniff II on February 24, 1984. *Id.*

■ Plaintiffs claim that because the certificate held by Braniff II was issued after October 1978, their employment by Braniff II did not extinguish their first hire rights. The CAB referred to the transfer as a "reissue" of the certificate held by Braniff I, however, and the transaction was between a parent corporation and its subsidiary. We conclude that even though Braniff II operated under a certificate issued after October 24, 1978, it was a certificated carrier for the purposes of the EPP because the certificate was merely transferred from a certificated carrier (Braniff I) to its newly-formed subsidiary (Braniff II).

A Department of Labor letter reflecting a different opinion does not change our conclusion. In a January 1991 letter to United Airlines, the DOL concluded that Braniff I employees who went to work for Braniff II did not lose their right of first hire since the certificate of Braniff II was issued in February 1984. The strength of a department's reasoning is central in deciding how much weight its opinion should be accorded. *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *see* section I, *supra.* Here the DOL applied the statute in a conclusory manner without discussing all the circumstances of the situation or how Congress might have intended it to be resolved. We find the department's reasoning unpersuasive in light of the facts previously discussed related to the transfer.

■ We conclude that Braniff I pilots who accepted employment with Braniff II were rehired by their former carrier, within the meaning of 29 C.F.R. § 220.10(c), and therefore lost their first hire rights gained when furloughed by Braniff I. If any of them were furloughed by Braniff II prior to October 23, 1988, they may have once again become entitled to a right of first hire under the EPP. 29 C.F.R. § 220.10(c); 49 U.S.C. § 42101(a). Braniff II employees who were furloughed or terminated after that date did

---

9. 49 U.S.C. § 42103 reads:

A protected employee of an air carrier regulated by the Secretary of Transportation who was furloughed or whose employment was ended by the carrier (except for cause) before October 23, 1988, is entitled to be the first employed in the occupational specialty of the employee, regardless of the employee's age, by any other air carrier holding a certificate under section 41102 of this title before October 24, 1978. However, the air carrier may recall its furloughed employees before hiring a protected employee of another air carrier regulated by the Secretary who was furloughed or whose employment was ended by the other carrier (except for cause) before October 23, 1988. An employee hired by an air carrier under this section retains seniority and recall rights with the air carrier that furloughed or ended the employment of the employee.

This section underlies the regulation at issue, 29 C.F.R. § 220.10(c). A protected employee recalled by his former carrier would be hired by an airline holding a pre-EPP certificate because an employee must be employed and then fur-

loughed and terminated from a certificated carrier to become a "protected employee" in the first instance. 49 U.S.C. § 42101(a)(3).

10. As the district court noted, the administrative law judge (ALJ) who reviewed the transfer application was troubled by the fact that Braniff I had failed to comply with various federal statutes and regulations. The ALJ concluded, however, that those violations should not be held against the new ownership and management of Braniff II. *Braniff, Inc., Fitness Investigation,* 106 C.A.B. 1, 37 (February 9, 1984). He characterized Braniff II as "a new carrier rising from the ashes of Braniff Airways" and suggested that "[t]he only real connection between the two is the use of the Braniff name and the use of certain Braniff Airway's assets." *Id.* Because the ALJ was concerned with corporate compliance with federal regulations, changes at the top of Braniff II were highly relevant. In contrast, changes in management and ownership are relatively unimportant in the inquiry here because transfer of control alone does not fundamentally alter the identity or work of a corporation.

not gain new first hire rights, however. Any plaintiffs who left Braniff II when it ceased operations in 1989 may therefore only sue on Northwest's alleged failure to hire them before they joined Braniff II because they had no first hire rights when they applied subsequently.

## III.

The final issue relates to the limitations period for right of first hire cases. Congress did not provide a statute of limitations. The district court applied the one year period from the Minnesota Human Rights Act, (MHRA), Minn. Stat § 363.06, subd. 3. 848 F.Supp. at 887–90. Northwest argues that the six month period from § 10(b) of the National Labor Relations Act (NLRA), codified at 29 U.S.C. §§ 160(b), should govern the actions. The plaintiffs contend that the district court was correct in using a state statute of limitations, but that it should have chosen the six year period under a general Minnesota provision for causes of action created by statute. Minn.Stat. § 541.05, subd. 1(2).

▮ When Congress does not provide a statute of limitations in federal legislation, the most closely analogous state limitations period is generally applied. *Reed v. United Transportation Union,* 488 U.S. 319, 324, 109 S.Ct. 621, 625, 102 L.Ed.2d 665 (1989). Courts will apply a federal statute of limitations, however, if "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (quoting *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)). Because this case fits within that narrow exception, we conclude that a six month federal statute of limitations borrowed from § 10(b) of the NLRA is most appropriate under the unusual circumstances presented by the EPP.

▮ Federal law provides a more analogous limitations period than state law. The EPP creates a right of first hire, a cause of action that was unknown at common law. Certificated carriers are not only prohibited from discriminating against former employees of other airlines, but they must hire them if they are qualified. As the Third Circuit has held, this is directly analogous to an employer's duty to rehire an employee after an economic strike. *See Haggerty v. USAir, Inc.,* 952 F.2d 781, 787 (3rd Cir.1992) (applying six month statute of limitations from § 10(b) to the EPP). Following a lawful strike, strikers have an ongoing right to reinstatement until they find comparable employment elsewhere unless the employer has sufficient justification not to reinstate. *See N.L.R.B. v. Fleetwood Trailer Co.,* 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967). Causes of action by strikers alleging that an employer has failed to reinstate them are governed by the six month statute of limitations. *See Burris v. International Bhd. of Teamsters,* 216 F.Supp. 38, 39 (W.D.N.C.1963); *California Distribution Centers, Inc. v. N.L.R.B.,* 308 N.L.R.B. 64, 1992 WL 191674 (July 30, 1992). Just like workers who strike, displaced employees have a right to be rehired, in this case by other certificated carriers.

▮ In contrast, the state statute chosen by the district court is a less appropriate fit. The MHRA provides remedies for an applicant who was not hired because of discrimination based on factors such as sex, race, religion, age, and marital status. Minn.Stat. § 363.06, subd. 3. The MHRA creates a duty not to discriminate, but unlike the EPP, it does not create a mandatory duty to hire. This difference leads to the conclusion that an action by a striker seeking reinstatement provides a closer analogy to the EPP than the MHRA.

The NLRA limitations period is also more analogous than the six year period provided by state law for actions "[u]pon liability created by statute, other than those arising upon a penalty or forfeiture...." Minn.Stat. § 541.05, subd. 1(2). Unlike that statute, the six month period in § 10(b) reflects an effort to balance the interests of employers and employees. *See DelCostello,* 462 U.S. at 171, 103 S.Ct. at 2294. The Minnesota catchall statute is so broad that many types of actions

could arguably fit within its language, but it does not offer a suitable analogy for EPP cases or an appropriate limitations period given the competing interests underlying the federal legislation.

Courts which have rejected a uniform federal period have borrowed periods based on differing state statutes of limitations. *See Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 741–44 (D.C.Cir.1995) (three year District of Columbia catchall statute); *Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1004–07 (10th Cir.1992) (two year Colorado federal rights statute), *cert. denied* —— U.S. ——, 113 S.Ct. 97, 121 L.Ed.2d 57 (1992); *McDonald v. Piedmont Aviation, Inc.*, 930 F.2d 220, 224–25 (2nd Cir.1991) (three year Massachusetts statute for torts), *cert. denied* 502 U.S. 969, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991); *Gonzalez v. Aloha Airlines, Inc.*, 940 F.2d 1312 (9th Cir.1991) (two year Hawaii statute for federal statutory rights). The fact that the borrowed periods vary from those for civil rights to torts to general statutory rights suggests that state statutes of limitations generally do not provide close analogues to the EPP. Their application leads to a confusing pattern nationwide.

Use of a state limitations period could frustrate the policies underlying the EPP. *Reed*, 488 U.S. at 324, 109 S.Ct. at 625. The airline industry is national in scope.[11] It is so vital to commerce that it also comes under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, which was intended to prevent interruptions in service by reducing labor strife and requiring nondisruptive resolution procedures. 45 U.S.C. §§ 151, 151a; *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 809 F.2d 483 (8th Cir. 1987), *aff'd per curiam by an equally divided court*, 485 U.S. 175, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988); *Barnett v. United Air Lines, Inc.*, 738 F.2d 358, 360 (10th Cir.1984); *see also, Hunt v. Missouri Pacific R.R.*, 729 F.2d 578 (8th Cir.1984) (per curiam) (applying six month statute of limitations to labor dispute). Air carriers operate in many states and have offices in many cities. As a result, they are subject to suit in many states, and EPP cases may be brought in a variety of districts.

A single hiring of a non-protected employee by an airline can trigger EPP suits by displaced employees around the nation. *Cf. Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 153–54, 107 S.Ct. 2759, 2765–66, 97 L.Ed.2d 121 (1987). Even though the group of protected employees is limited, in the absence of a uniform limitations period it could be necessary to litigate the issue of which state statute is applicable for each of the fifty states. Given the limited life span of the EPP, such an investment of judicial resources is of questionable utility. Application of a uniform period would avoid confusion and treat the small number of employees and carriers similarly, as well as discourage forum shopping.

Suits brought many years after a failure to hire could be more disruptive to the interests of other airline employees than those brought after a shorter period of time. *Cf. DelCostello*, 462 U.S. at 171, 103 S.Ct. at 2294. Long delayed insertion into seniority rolls would not promote the EPP's purpose of protecting employee security in the deregulated industry.

On the other hand, protected employees must have sufficient time to file suit after any violation by a carrier. It appears unlikely that a six month limitations period would seriously interfere with the exercise of their first hire rights. Nothing in the record suggests that employees could not monitor the airlines and bring suits within six months. The Secretary of Labor maintains a list of available positions subject to the duty to hire, and protected employees may telephone the Department of Labor to discover information about available positions. 29 C.F.R. § 220.40. This enables displaced employees to monitor openings in their specialty and determine when a cause of action could arise if an unprotected employee is hired, 49 U.S.C. § 42103(b)(1), and there are a limited number of carriers to follow.[12] Moreover,

---

**11.** At the time the EPP was enacted, the airline industry was also one of the industries most heavily regulated by the federal government. Senate Rep. at 114.

**12.** It appears no more than 30 carriers had a

even if a protected employee failed to file a timely suit against a particular carrier, he could continue to reapply and sue if the carrier again hired an unprotected employee at a later time.

A six month limitations period allows time for filing of a suit when the duty to hire is violated while also protecting interests of other airline employees and the carriers themselves. Congress thought six months an appropriate balance under the NLRA, and the temporary nature and unique characteristics of the EPP suggest that the same limitations period is warranted.

The six month period from § 10(b) is based on a closer analogy to the EPP than is available under a state statute. Section 10(b) also strikes a balance between the important first hire rights created by the EPP and the interests of current airline employees and the carriers. A uniform statute also will make litigation of EPP claims more efficient. For these reasons, the EPP falls within the narrow exception to the general rule that a state statute of limitations should apply.

## IV.

After carefully considering the record and the arguments of the parties, we conclude that the duty to hire under the EPP did not expire on October 23, 1988, that accepting employment with Braniff II extinguished any first hire rights held by the plaintiffs at that time, and that the six month statute of limitations from § 10(b) of the NLRA should be applied to first hire actions under the EPP. We therefore affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

duty to hire during the period relevant in this case. Of 51 certificated airlines in October 1978, at least two-fifths have ceased operations or merged with other airlines. *See* 29 C.F.R. § 220, App. I. Many of the certificated carriers are regional airlines, and protected employees appear not to focus their attention on them. The plaintiffs here, for example, filed suit against only five airlines, all of which are major national carriers.